IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**CYNTHIA D. PAJAK,**

    **Plaintiff,**

v.                                           **CIVIL ACTION NO. 1:19-CV-160**
                                                   **JUDGE KEELEY**

**UNDER ARMOUR, INC.,**
**UNDER ARMOUR RETAIL, INC.,**
**and BRIAN BOUCHER,**

    **Defendants.**

**NOTICE OF VIDEOGRAPHIC
RULE 30(b)(6) DEPOSITION OF UNDER ARMOUR, INC. AND
UNDER ARMOUR RETAIL, INC.**

        Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, you are hereby notified that the deposition of Under Armour, Inc. and Under Armour Retail, Inc., collectively referred to herein as ("UA") will be taken upon oral examination and videographic means at a date, time and location to be mutually agreed upon among counsel.  Pursuant to Rule 30(b)(6) one or more designees of said corporation shall appear to be deposed concerning the following topics:

        1.      UA's record retention program and related policies effective in 2018 and 2019, including its policies or practices utilizing Relativity as a preservation tool.

        2.      UA's efforts to locate documents responsive to Plaintiff's Discovery Requests in any form.

        3.      UA's litigation hold issued in this case.

        4.      The date on which any litigation hold was issued relating to Ms. Pajak's case and to whom the hold was issued.

11875683

**EXHIBIT A**

5. Any and all steps taken by UA to preserve the contents of Brian Boucher's company-issued cell phone, iPad and laptop.

6. The location of the cellular phone, iPad and laptop issued to and used by Mr. Boucher while employed with UA.

7. Any and all steps taken by UA to preserve the contents of Cynthia Pajak's company-issued cell phone, iPad and laptop.

8. The location of the cellular phone, iPad and laptop issued to and used by Ms. Pajak while employed with UA.

9. Any and all steps taken by UA to preserve the contents of Melisa Miller's company-issued cell phone, iPad and laptop.

10. The location of the cellular phone, iPad and laptop issued to and used by Ms. Miller while employed with UA.

11. Any and all steps taken by UA to preserve the contents of George Hanson's company-issued cell phone, iPad and laptop.

12. The location of the cellular phone, iPad and laptop issued to and used by Mr. Hanson while employed with UA.

13. Any and all steps taken by UA to preserve the contents of Jim Toner's company-issued cell phone, iPad and laptop.

14. The location of the cellular phone, iPad and laptop issued to and used by Mr. Toner while employed with UA.

15. Any and all steps taken by UA to preserve the contents of Josh Denton's company-issued cell phone, iPad and laptop.

16. The location of the cellular phone, iPad and laptop issued to and used by Mr. Denton while employed with UA.

17. The corporate structure of, and any organizational charts describing or outlining, UA, and its corporate parents, subsidiaries, affiliates, and sister corporations.

18. The structure of UA's human resources department, including number of employees, names, educational background, and reporting relationships during the period 2017-2019.

19. The existence and contents of any reservation of rights communication issued to UA or Mr. Boucher concerning coverage for the claims set forth in Ms. Pajak's complaint.

20. The contents of Ms. Pajak's personnel file.

21. The identity of the person who prepared the notes shown on UA ESI 0018877.

22. Any documentation which supported the notes found on UA ESI 0018877.

23. All information in UA's possession, including any supportive documentation, regarding Ms. Pajak's 9-box rating for the years 2016, 2017, and 2018.

24. All information in UA's possession, including any supportive documentation, regarding Ms. Pajak's performance for the years 2013- 2018.

25. All information in UA's possession, including any supportive documentation, regarding the termination of Ms. Pajak's employment.

26. All information in UA's possession, including any supportive documentation, regarding Ms. Pajak's activities relating to her Performance Improvement Plan.

27. The identity of the person or persons who made the ultimate decision to terminate Ms. Pajak's employment.

28. All information in UA's possession, including any supportive documentation, regarding the participation of Brian Boucher in the decision to terminate Ms. Pajak's employment.

29. All information in UA's possession, including any supportive documentation, regarding the participation of Jim Toner in the decision to terminate Ms. Pajak's employment.

30. All information in UA's possession, including any supportive documentation, regarding the participation of Megan McClain in the decision to terminate Ms. Pajak's employment.

31. All information in UA's possession, including any supportive documentation, regarding the participation of Melisa Miller the decision to terminate Ms. Pajak's employment.

32. All information in UA's possession, including any supportive documentation, regarding the participation of George Hanson in the decision to terminate Ms. Pajak's employment.

33. All information in UA's possession, including any supportive documentation, regarding the participation of Josh Denton in the decision to terminate Ms. Pajak's employment.

34. All information concerning the financial performance of the East Region in comparison to the West Region in 2018.

35. All information and documents relating to any comparison made between Tara Stewart and Cynthia Pajak's performance in 2018.

36. Ms. Pajak's compensation (including bonus eligibility and benefits) for the years 2016, 2017 and 2018.

37. The cost to UA of providing all benefits, other than W-2 wage benefits, to Ms. Pajak during her employment.

38. The compensation system, including pay scales, pay grades, or pay steps, if any, in effect during 2016-present for Regional Directors and the procedure or method used to determine an employee's salary or wage, bonus, or incentive compensation, merit increases, and other monetary compensation.

39. The benefits provided to Regional Directors, including any health and welfare programs, retirement benefits, insurance plans, pension or profit-sharing plans, stock

11875683

bonus plans, deferred compensation programs, leave programs, and any other fringe benefits provided to employees from 2016 to present.

40. UA's policies and procedures and/or practices for handling complaints made by employees regarding sexual harassment, gender discrimination and/or retaliation.

41. All information in defendants' possession regarding complaints made about Cyndi Pajak by other Under Armour employees which factored into the decision to terminate her employment.

42. Any investigations, and the results and details thereof, regarding any of the complaints made by Ms. Pajak relating to Mr. Boucher, Mr. Costigan, and Mr. McKenna which are referred to in her Complaint.

43. Any investigations, and the results and details thereof, regarding any of the complaints made by Ms. Pajak relating to Mr. Boucher made to Mr. Toner, Ms. McClain, Ms. Miller or any other member of UA's human resources team in 2018.

44. Any other complaints of retaliation relating to a report of sexual harassment or gender discrimination made against UA in the past five (5) years, including formal and informal internal complaints, complaints filed with the Equal Employment Opportunity Commission (EEOC), West Virginia Human Rights Commission or the Maryland Human Rights Commission, and lawsuits.

45. Any complaints made by UA's employees to Tara Stewart concerning sexually inappropriate conduct or gender discrimination in 2017 or 2018 which Ms. Stewart

elevated to a member of human resources or Brian Boucher. Additionally, any investigations conducted by UA concerning these complaints.

46. Any complaints made by UA's employees to Shea Louie concerning sexually inappropriate conduct or gender discrimination in 2017 or 2018 which Ms. Louie elevated to a member of human resources or Brian Boucher. Additionally, any investigations conducted by UA concerning these complaints.

47. UA's knowledge and response to any complaints or concerns raised by Ms. Pajak concerning Brian Boucher.

48. UA's knowledge and response to any complaints or concerns raised by Kristin Gladkowski concerning Brian Boucher.

49. UA's knowledge and response to any complaints or concerns raised by Dayna Perillo concerning Brian Boucher.

50. The contents of the non-disclosure agreement executed by Dayna Perillo.

51. UA's knowledge and response to any complaints raised by Matthew Webster concerning Brian Boucher.

52. UA's knowledge and response to any complaints raised by Kim Nickels concerning Brian Boucher.

53. The contents of any non-disclosure agreement executed by Kim Nickels.

54. UA's knowledge and response to any complaints raised by Missy Sage concerning Brian Boucher.

11875683

55. The contents of any non-disclosure agreement executed by Missy Sage.

56. UA's knowledge and response to any complaints raised by Angel Yanke concerning Brian Boucher.

57. The contents of any non-disclosure agreement executed by Angel Yanke.

58. Any dispute, and subsequent settlement agreement, entered into between UA, Mr. Boucher and/or Taymax.

59. Training that UA provided to George Hanson, Brian Boucher, Melisa Miller, Jim Toner, Megan McClain, Jocelyn Carpenter, Cyndi Pajak, Shea Louie and Tara Stewart regarding how to handle, report, process, or otherwise address claims of discrimination, harassment, or retaliation, the method of delivery for the training, the materials provided to attendees during any training, the frequency and timing of such training, and the staff involved in providing such training.

60. UA's policies, procedures, and practices for conducting and documenting performance reviews or compensation reviews applicable to Regional Directors during 2016-2018, and the decision makers involved in performance review or compensation reviews for Regional Directors, including those who provided input and those who had final authority.

61. UA's policies, procedures and/or practices for issuing and documenting discipline to Regional Director-level employees.

62. UA's policies, procedures and/or practices for issuing and documenting coaching to Regional Director-level employees.

63. UA's policies, procedures and practices concerning "Performance Improvement Plans" or "PIPs" as corrective action or developmental tools.

64. UA's policies, procedures and practices concerning "Action Plans" as corrective action or developmental tools.

65. UA's policies, procedures and practices concerning "360 Evaluations" as corrective action or developmental tools.

66. UA's policies, procedures and/or practices for monitoring Yammer posts and removing inappropriate content, if found.

67. UA's travel reimbursement policies which were applicable to North American Retail in 2018.

68. UA's fraternization policies which were applicable to Under Armour North American Retail in 2018.

69. UA's policies, procedures and/or practices relating to exit interviews.

70. The identity of the person(s) that prepared the power point presentation identified as UnderArmour 002068-002080.

71. The information and facts relied on in preparing the power point presentation identified as UnderArmour 002068-002080.

72. The identity of the person(s) that prepared the notes/talking points found at UAESI 013803-013808.

73. The information and facts relied on in preparing the notes/talking points found at UAESI 013803-013808.

74. The results of the Engagement Survey conducted in 2018 (as reflected on documents bates numbered UnderArmour 002614-002722) for North American Retail, and a comparison of results for the East Region vs. the West Region.

75. Any action items identified as a result of the Engagement Survey conducted in 2018 (as reflected on documents bates numbered UnderArmour 002614-002722) for North American Retail, steps taken to implement those items, and any success realized in completing those items.

76. The Culture Action Plan identified at Under Armour 002063, any steps undertaken by UA to implement the Plan, and any successes realized in implementation of the Plan.

77. Information and facts relating to the indemnity or defense arrangements that have been entered into between the Under Armour entities, any insurer, and Brian Boucher.

78. Information and facts relating to any financial arrangements concerning the legal representation that has been extended to any non-party witness.

79. The identities of any persons involved in interviewing, making recommendations for hire, and/or hiring Mr. Boucher.

80. The identities of any persons involved in the decision to promote Mr. Boucher to Head of Stores.

81. The identities of any persons involved in the decision to promote Mr. Boucher to Director of Global Operations.

82. The identities of all of Mr. Boucher's immediate supervisors while employed by UA.

83. The identities of all human resources employees who supported Mr. Boucher in managing his subordinates during his employment with UA.

84. Any open DM positions from June 2018 to January 1, 2019.

85. Any open "operations" positions, as identified by Mr. Boucher in his deposition for which Ms. Pajak might have qualified from June 2018 to January 2019.

86. The number of UA's employees or contract workers who worked in West Virginia in 2017 and 2018.

87. The number of UA's employees or contract workers who lived in West Virginia in 2017 and 2018.

88. The title and description of any jobs performed by any employee living in or working in West Virginia in 2017-2018.

89. Any payroll taxes paid to the State of West Virginia by UA 2017 and 2018.

90. Any workers compensation premiums paid by UA relating to employees living or working in West Virginia in 2017 and 2018.

11

91. Any unemployment claims made to Workforce West Virginia by any employee of UA in 2017 and 2018.

92. Information and facts relating to and purportedly supporting each of the 11 affirmative defenses asserted in Under Armour's Answer in this case.

93. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 5 of the Complaint to the extent the same are denied.

94. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 6 of the Complaint to the extent the same are denied.

95. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 9 of the Complaint to the extent the same are denied.

96. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 10 of the Complaint to the extent the same are denied.

97. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 11 of the Complaint to the extent the same are denied.

98. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 12 of the Complaint to the extent the same are denied.

99. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 13 of the Complaint to the extent the same are denied.

100. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 14 of the Complaint to the extent the same are denied.

101. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 19 of the Complaint to the extent the same are denied.

102. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 20 of the Complaint to the extent the same are denied.

103. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 22 of the Complaint to the extent the same are denied.

104. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 23 of the Complaint to the extent the same are denied.

105. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 24 of the Complaint to the extent the same are denied.

106. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 25 of the Complaint to the extent the same are denied.

107. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 28 of the Complaint to the extent the same are denied.

108. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 30 of the Complaint to the extent the same are denied.

109. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 31 of the Complaint to the extent the same are denied.

110. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 32 of the Complaint to the extent the same are denied.

11875683

111. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 33 of the Complaint to the extent the same are denied.

112. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 34 of the Complaint to the extent the same are denied.

113. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 35 of the Complaint to the extent the same are denied.

114. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 37 of the Complaint to the extent the same are denied.

115. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 42 of the Complaint to the extent the same are denied.

116. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 46 of the Complaint to the extent the same are denied.

117. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 47 of the Complaint to the extent the same are denied.

118. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 49 of the Complaint to the extent the same are denied.

119. All facts in UA's possession upon which it bases its denial of the allegations of Paragraph 56 of the Complaint to the extent the same are denied.

120. All facts concerning any alleged deficiencies in Ms. Pajak's performance as referenced in UA's response to Interrogatory No. 3 of "Defendant Under Armour, Inc. and

Under Armour Retail, Inc.'s Responses to Plaintiff's First Set of Interrogatories," including the identities of any of Ms. Pajak's colleagues who allegedly observed those deficiencies.

121. All facts concerning any alleged failure by Ms. Pajak to "develop or mange her team" as referenced in UA's response to Interrogatory No. 3 of "Defendant Under Armour, Inc. and Under Armour Retail, Inc.'s Responses to Plaintiff's First Set of Interrogatories."

122. The identities of any other UA employees who were terminated for any similar alleged deficiencies to Ms. Pajak as set forth in UA's response to Interrogatory No. 3 of "Defendant Under Armour, Inc. and Under Armour Retail, Inc.'s Responses to Plaintiff's First Set of Interrogatories."

PLEASE TAKE FURTHER NOTICE that UA is requested pursuant to Rule 30(b)(6) to produce, at the deposition, and permit Plaintiff to inspect and copy all documents and tangible things in the possession, custody or control of the UA which relate to the above-listed matters.

Dated December 18, 2020

*/s/ Allison B. Williams*
Larry J. Rector (WV Bar No. 6418)
Allison B. Williams (WV Bar No. 11329)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, West Virginia 26330
(304) 933-8000 (telephone)
Email:  larry.rector@steptoe-johnson.com
        Allison.williams@steptoe-johnson.com

*Counsel for Plaintiff*

11875683

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**CYNTHIA D. PAJAK,**

    **Plaintiff,**

v.                                            **CIVIL ACTION NO. 1:19-CV-160**
                                                                **JUDGE KEELEY**

**UNDER ARMOUR, INC.,**
**UNDER ARMOUR RETAIL, INC.,**
**and BRIAN BOUCHER,**

    **Defendants.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of December, 2020, I electronically filed the foregoing Certificate of Service for **"Notice of Videographic Rule 30(b)(6) Deposition of Under Armour, Inc. and Under Armour Retail, Inc."** with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following:

| | |
|---|---|
| Justin M. Harrison, Esq. | Scott Kaminski, Esq. |
| Grace E. Hurney, Esq. | Kaminski Law, PLLC |
| Jackson Kelly PLLC | Post Office Box 3548 |
| 500 Lee Street, East, Suite 1600 | Charleston, West Virginia 25335-3548 |
| Post Office Box 553 | |
| Charleston, West Virginia 25322 | |

I further certify that, on this same date, I served a full and complete copy of the foregoing upon counsel of record, by depositing a true copy thereof, in the United States mail,

                                                        /s/ *Allison B. Williams*
                                                        Allison B. Williams (WV Bar No. 11329)

11875683