# EXHIBIT B

# In The Matter Of:

*CYNTHIA PAJAK v.*
*UNDER ARMOUR, INC., ET AL*

*BRIAN BOUCHER*
*November 20, 2020*

*Reedy Court Reporting*
*304.615.6725*

Original File brian boucher 11-20-2020.txt
**Min-U-Script® with Word Index**

```
                                                                    1

         IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF wEST VIRGINIA



 * * * * * * * * * * * * * * * * * * * * * * * *

 CYNTHIA D. PAJAK,

          Plaintiff,

 vs.                          CIVIL ACTION NO. 1:19-cv-160

 UNDER ARMOUR, INC.
 UNDER ARMOUR RETAIL, INC.,
 AND BRIAN BOUCHER,

          Defendants.

 * * * * * * * * * * * * * * * * * * * * * * * *



         Zoom deposition of BRIAN BOUCHER taken by the
 Defendant under the West Virginia Rules of Civil
 Procedure in the above-entitled action, pursuant to
 notice, before Teresa Reedy, a Registered Professional
 Reporter, at 8:00 a.m., on the 20th day of November,
 2020.




                 REALTIME REPORTERS, LLC
                     713 Lee Street
                  Charleston, WV  25301
                     (304) 344-8463
                   realtimereporters.net
```

```
                                                                  2

 1                            APPEARANCES:

 2

     APPEARING FOR THE PLAINTIFF:
 3
             Larry J. Rector, Esquire
 4           Allison B. Williams, Esquire
             Alisa Lazar, Esquire
 5           STEPTOE & JOHNSON, PLLC
             400 White Oaks Boulevard
 6           Bridgeport, WV  26330

 7
     APPEARING FOR THE DEFENDANT UNDER ARMOUR, INC.:
 8
             Justin Harrison, Esquire
 9           Grace E. Hurney, Esquire
             JACKSON KELLY, PLLC
10           500 Lee Street, Suite 1600
             Charleston, WV  25301
11

12   APPEARING FOR THE DEFENDANT BRIAN BOUCHER:

13
             Scott Kaminksi, Esuire
14           KAMINSKI LAW, PLLC
             P.O. Box 3548
15           Charleston, WV  25335

16
     ALSO PRESENT:
17
             Kristen Herbert, in-house counsel for Under
18   Armour

19

20

21

22

23

24
```

258

```
 1   relationship with all the people I worked with at Under
 2   Armour.
 3       Q.  Did you text anybody else asking them to hook
 4   up with you?
 5               MR. KAMINSKI:  Object to form.  You can
 6   answer.
 7       A.  I don't -- I didn't text anybody to hook up
 8   with me, but, again, you're putting that into a context
 9   of something that is no different than meeting or, you
10   know, visiting.  And so there was many times where I
11   asked other people if we were going to meet, are we
12   going to go to a local place and have a drink and chat
13   about business or something else.  So there was many
14   different text exchanges that I had coming to me or
15   going out to others with regard to meeting and
16   connecting regarding business or otherwise.
17       Q.  When you left Under Armour, did you keep your
18   company-issued cell phone?
19       A.  No, I ported my number but I returned my cell
20   phone to the company.
21       Q.  Who did you provide it to?
22       A.  Jeanie DiCisco.
23       Q.  Did you delete your text messages before
24   returning it to the company?
```

259

1     A.   The company had scanned my phone prior to
2 leaving and wiped the entire phone and then everything
3 was deleted from that point forward.
4     Q.   You say the company had -- explain that again.
5 What did you say?
6     A.   The company -- before I left the company they
7 had a -- they had taken my phone to scan any messages,
8 emails or whatever because I had asked to keep my phone
9 for 30 days and I ported the number.  And so I turned
10 my laptop and my phone in so they could have full
11 access to anything that was on those and then I was
12 able to keep my phone, change carriers, kept the same
13 number.
14     Q.   Prior to giving the phone to the company, did
15 you delete your text exchanges with Kristen Gladkowski?
16     A.   I believe I did.
17     Q.   Okay.  Prior to giving the phone to the
18 company, did you delete your text messages with Cyndi
19 Pajak?
20     A.   I had turned in everything with regard to my
21 exchanges with Cyndi Pajak whether it be email, text or
22 otherwise.  Again, they scanned my phone for a, you
23 know, full recovery of anything that I had on there
24 with regard to any exchanges with anybody text or

260

Q. When did you delete the text messages you had with Kristen Gladkowski prior to giving your phone to Under Armour?

A. Again, I don't recall exactly when. Again, I think after the phone was scanned is when everything was wiped and deleted and I changed carriers and kept the number. So I think it was right around the time that I left after Under Armour had access to my phone and laptop was when everything was wiped clean.

Q. That's when Under Armour wiped it, correct?

A. They -- yeah, they did. I turned in my laptop and then they scanned my phone and wiped it. I still had service obviously for 30 days per my separation agreement or when I separated and then I sent the phone back to them as soon as got my new phone and ported the number.

Q. My question, though, to you is prior to giving the phone to Under Armour and allowing them to wipe it, when did you delete text messages from your phone?

A. I don't think I deleted anything from my phone before they had wiped it in March.

Q. So you believe that when you gave the phone to Under Armour it still had all of the text messages that

261

1  you had exchanged with Kristen Gladkowski?
2       A.  I believe it did.
3       Q.  Did it have all the text messages that you
4  exchanged with other subordinates of yours at Under
5  Armour when you gave them your cell before you left?
6       A.  Again, I can't speak to what the scanning of
7  the phone extracted and pulled, but my understanding is
8  that they had access to anything that I had texted for
9  them to be able to scan the phone and get copies of any
10 correspondence I had with any subordinates or partners
11 or anyone at Under Armour for that matter.
12      Q.  Was your phone an iPhone?
13      A.  It was, yes.
14      Q.  Did you use an iCloud backup?
15      A.  I believe I did.
16      Q.  And what would have been your password for the
17 iPhone that you had at Under Armour?
18      A.  I don't remember that.
19      Q.  Did you provide that to Under Armour when you
20 gave them the device?
21      A.  I did.
22      Q.  Did you provide them to the access codes
23 needed for the iPhone backup that you used?
24      A.  Yeah, they had access to all of that when they

262

1  scanned it, yes.
2      Q.  So it's your testimony that Under Armour
3  should have all of the data, text messages and emails
4  that would have been on your phone at the time you gave
5  it to them before you left?
6      A.  Again, I don't know the exact parameters of
7  what they did in scanning the phone before I had left,
8  but they had full access to everything that you
9  mentioned with regard to a password to enter into the
10 phone or any iCloud account that I do.
11     Q.  You knew that your phone prior to your
12 departing in March of 2019 was the subject of a
13 litigation hold; isn't that true?
14     A.  That's correct.
15     Q.  How were you made aware that your phone was
16 the subject of a litigation hold?
17             MR. KAMINSKI:  Let me interpose an
18 objection to the extent that Mr. Boucher learned that
19 through Under Armour's counsel as an employee of Under
20 Armour.  I believe that would be protected by
21 attorney/client privilege.  However, I do think you're
22 allowed to know if he knew that there was a litigation
23 hold.  So you can proceed to answer if you are able to
24 without divulging attorney/client privilege,

263

1  Mr. Boucher.
2      A.  I received an email notification that there
3  was a -- that I was not to delete, remove or do
4  anything with regard to emails or any other
5  correspondence that I had with Ms. Pajak or anything
6  associate with that complaint I guess is what I would
7  characterize.
8      Q.  And that included your Outlook folders as well
9  you testified to earlier?
10     A.  That would include any correspondence or any
11 file or anything, correct.
12     Q.  When did you get the email notification of the
13 litigation hold?
14     A.  I don't recall the exact date, Mr. Rector.  I
15 believe it was in January.
16     Q.  Of 2019?
17     A.  Correct.
18     Q.  That could have been as much as two months
19 before you left in March, correct?
20     A.  Again, I don't recall the exact date, but it
21 was definitely a time frame by which it was before I
22 left the company.  I believe it to be some time in
23 January or February, but I can't recall the exact date.
24     Q.  How did you come to leave the company?

382

1  separated with a package. It's -- that's a pretty
2  common practice when you're talking about performance
3  issues leaders is if we get to that point and we had to
4  put a package together for Ms. Pajak. So it's not
5  uncommon to have those conversations what you're going
6  down a performance path with somebody as a potential
7  option if you get to that.
8      Q. Is that a common practice at Under Armour or
9  in your prior experience in retail?
10     A. It's both. You know, it's been a -- you know,
11 I would say Under Armour was not quite as -- they were
12 a little bit more -- they weren't quite as open I guess
13 is the right term as some of my prior companies with
14 regard to offering people severance packages as a means
15 by which to help them transition out of the company
16 that Under Armour was, but certainly Under Armour did
17 offer packages to people in the past, and so that's
18 where the conversation originated with Mr. Toner and
19 myself.
20     Q. Bear with me just a second.
21         Mr. Boucher, I want to change the subject
22 to your iPhone. Before you left Under Armour, Under
23 Armour requested that you hand over your iPhone for
24 imaging; is that right?

383

1  A. Correct.
2  Q. Do you recall who you handed it to?
3  A. Kristen Herbert.
4  Q. Just so the record's clear, she's in-house
5  counsel at Under Armour?
6  A. Correct.
7  Q. And you did that your last day of employment;
8  is that correct?
9  A. That's correct.
10 Q. Mr. Boucher, I'll represent to you that Under
11 Armour took an image of your cell phone and was unable
12 to locate any text between you and Ms. Kristen
13 Gladkowski. Do you have any explanation as to why that
14 occurred?
15 A. Again, I don't know if I had the backup on or,
16 you know, certainly as I was getting ready to leave the
17 company, I cleared up a lot of emails. Everything that
18 was related to the Cyndi Pajak situation had been
19 forwarded to Jim Toner and anything else both on my
20 phone and email I would have gotten rid of, you know,
21 for -- I didn't need it and Under Armour didn't need
22 it. So that may have been the case why they didn't
23 have any emails or text messages between Kristen and
24 myself.

384

1  Q.  Okay.  That may have been true for text
2  messages between you and others, is that correct, not
3  just Ms. Gladkowski?
4  A.  Sure.
5  Q.  Okay.  Just to be clear.  You're not accusing
6  Under Armour of destroying evidence, are you?
7  A.  Absolutely not.
8  Q.  Okay.  Bear with me for just a second.
9     MR. HARRISON:  And, Counsel, if you don't
10 mind taking a two-minute break, we can go off the
11 record and, Scott, you can probably count it against my
12 time if you want.  I just need to check on something.
13 I don't want to belabor this.
14     (Break taken.)
15 BY MR. HARRISON:
16 Q.  Mr. Boucher, I only have a few more questions
17 for you.  You testified earlier that your departure
18 from Under Armour was voluntary, correct?
19 A.  Correct.
20 Q.  Nobody at Under Armour asked you to leave?
21 A.  Absolutely not.
22 Q.  Your departure from Under Armour didn't have
23 anything to do with Cyndi Pajak?
24 A.  Zero.