1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF WEST VIRGINIA

3   Cynthia D. Pajak,

4        Plaintiff,

5              vs.                    CIVIL ACTION NO.

6                                     1:19-cv-160

7   Under Armour, Inc.,
    Under Armour Retail, Inc.,
8   and Brian Boucher,

9        Defendants.

10                          - - -

11       Proceedings had in the motion hearing of the above-styled
    action on July 21, 2021, before Honorable Michael J. Aloi,
12  Magistrate Judge, in Clarksburg, West Virginia, via Zoom video
    conference.

13                          - - -

14       APPEARANCES:

15       On behalf of the Plaintiff:

16       Larry J. Rector
         Amy M. Smith
17       Steptoe & Johnson, PLLC
         400 White Oaks Boulevard
18       Bridgeport, WV  26330
         304.933.8000

19

20  APPEARANCES CONTINUED ON NEXT PAGE

21

22

23

24

25

1        On behalf of the Defendants Under Armour, Inc. and Under
Armour Retail, Inc.:

2

3        Justin M. Harrison
         Grace E. Hurney
         Jackson Kelly, PLLC
4        500 Lee Street, Suite 1600
         Charleston, WV  25322
5        304.340.1357

6        Amy Estelle Askew
         Kramon & Graham, PA
7        1 South Street, Suite 2600
         Baltimore, MD  21202
8        410.319.0512

9        On behalf of Defendant Brian Boucher:

10       Scott H. Kaminski (appearing via telephone)
         Ray, Winton & Kelly, PLLC
11       109 Capitol Street, Suite 700
         Charleston, WV  25311
12       304.342.1141

13   ALSO PARTICIPATING:  Nathan Fetty, Law Clerk to Honorable
     Michael J. Aloi

14

15

16

17

18

19

20

21

22

23

24

25

1          Wednesday Afternoon Session,

2          July 21, 2021, 3:00 p.m.

3                    - - -

4          THE CLERK:  This is the matter of Cynthia D. Pajak

5   versus Under Armour, Inc. et al., Case Number 1:19-CV-160.

6   This matter comes on for a hearing on motions of plaintiff and

7   defendant regarding discovery.

8          Will counsel please note their appearance for the

9   record.

10          MS. SMITH:  Amy Smith and Larry Rector for the

11   plaintiff, Cynthia Pajak.

12          MS. HURNEY:  Good afternoon.  Grace Hurney and Justin

13   Harrison, Jackson Kelly, on behalf of the Under Armour

14   defendants.

15          MR. KAMINSKI:  Good afternoon, Your Honor.  This is

16   Scott Kaminski on behalf of defendant Brian Boucher.

17          THE COURT:  Mr. Kaminski, I don't see you by video,

18   so you're just by phone; is that correct?

19          MR. KAMINSKI:  I am, Your Honor.  I expected to be

20   back in Charleston in time for this hearing, but I am not, and

21   out of respect for the Court, I did not have access to a jacket

22   and tie right now.

23          THE COURT:  You are fine.  I can hear you well.

24          Ms. Askew, you were going to introduce yourself.

25          MS. ASKEW:  Yes, Your Honor.  Good afternoon.  Amy

1    Askew on behalf of the Under Armour defendants.

2         THE COURT:  Okay.  Thank you, counsel.

3         So as a matter of logistics, I'm first going to

4    address a motion the -- the plaintiff's motion to compel full

5    and complete responses to discovery requests, and that has to

6    do with ECF Number 466.  And as you know, just, I think,

7    yesterday or the day before, Judge Keeley also referred motions

8    to me that were actually filed by the parties before this one,

9    but she didn't refer them to me until yesterday, although

10   they've been fully briefed.

11        I intend to do my best to address everything, because

12   I've already had the benefit of your briefing.  We're

13   getting -- I'm hearing myself again.  It has stopped.  No, it

14   hasn't.

15        Although it's not in order as the motions have been

16   filed, I know my law clerk talked with the parties and they're

17   prepared to address ECF Number 466 first because that was the

18   first one that was referred to us.

19        And so in regard to Under Armour, who's going to, at

20   least initially, be speaking to the motion to compel in

21   response, ECF Number 466?

22        MS. HURNEY:  Good afternoon, Your Honor.  Grace

23   Hurney.  I will be addressing Number 466.

24        NATHAN FETTY:  Your Honor, this is Nathan.  Let me

25   jump in for a second, please.  I think it may be helpful if

```
 1   everybody who's not speaking could mute themselves.  Let's
 2   try -- so Grace, if you would stay -- if you're going to be
 3   arguing, yeah, thank you, Larry or Amy.  Let's have Amy and
 4   Justin unmuted and see if that helps.  And everybody else
 5   muted.
 6              THE COURT:  Thank you, Mr. Fetty.
 7              Well, I do have -- I do want to speak to the
 8   plaintiff first in regard to ECF Number 466, so if everyone
 9   other than Mr. Rector and Ms. Smith would mute themselves, and
10   then we'll continue.
11              So I have a few questions -- are you going to handle
12   it, Ms. Smith?
13              MS. SMITH:  Yes, Your Honor.
14              THE COURT:  So let me --
15              NATHAN FETTY:  Judge, I'm sorry to interrupt.  If
16   Mr. Kaminski, if he hasn't, could mute on his end with his
17   telephone connection, that would be helpful, too.
18              MR. KAMINSKI:  I was muted and I will do it again.
19              NATHAN FETTY:  Just want to make sure.  Thank you.
20              THE COURT:  So Ms. Smith, there is a motion to compel
21   in regard to documents re the theft of Boucher's laptop
22   computer in 2018.  I have a note that you -- Under Armour has
23   supplemented their discovery and this is no longer in dispute.
24   Is that correct, or am I missing something?
25              MS. SMITH:  Your Honor, with regard to that first
```

1    request made in Mr. Rector's letter of June 14th, it is correct

2    that the -- just on Monday of this week, we received a

3    supplementation that included some documentation that the

4    laptop had been -- I'm trying to find the document here, but

5    that the laptop had been stolen from an airport in Bogota,

6    Colombia, I believe.  We received three pages Bates numbered

7    Under Armour 7175, 7176, 7177, and 7178, so four pages

8    regarding that.

9            There is a reference in here that Mr. Boucher or his

10   manager needs to submit a stolen report.  We don't have the

11   stolen report, but we do have a few emails from Mr. Boucher

12   indicating that his laptop had been stolen from an airport in

13   Bogota, Colombia.

14           THE COURT:  Let's stop on that one.  I now want to

15   hear from Ms. Hurney.  Do you know whether such a report

16   exists, the stolen report?

17           MS. HURNEY:  I do not know, Your Honor, if that

18   exists.

19           I would like to make a quick point of clarification.

20   Those documents were formally supplemented recently, but they

21   were provided previously in an informal fashion, given the

22   testimony regarding Mr. Boucher's laptop.

23           THE COURT:  Okay.  That's fine.  You broke up a

24   little in the beginning, so have you all looked for a formal

25   report like a stolen item report and it doesn't exist, or you

1   can't find it?

2            MS. HURNEY:  Your Honor, I do not believe we have

3   looked for it.  That can be something that we can do, Your

4   Honor.

5            THE COURT:  Okay.  Well, to the extent -- I know it

6   was mentioned in your documents.  If it can be supplemented

7   with that report, again, I mean, from the Court's perspective,

8   you've, I think, probably documented it sufficiently to verify

9   that it was stolen and where it was stolen from, but it

10  references a report, so to the extent that can be found and

11  provided, I would direct you all to do so.  And then we'll

12  go -- did you have anything else to say about that, Ms. Smith?

13           MS. SMITH:  Not with regard to the laptop that

14  apparently was stolen from the airport in Bogota, Colombia.

15           THE COURT:  Okay.  Well, that's fine.

16           We're going to go next to reports created by Steven

17  Kitchen about audits of UA's legal hold room.  Why don't you go

18  ahead and represent to the Court why you think that is relevant

19  and why you think it does not violate the attorney-client

20  privilege.

21           MS. SMITH:  Absolutely, Your Honor.

22           With regard to Mr. Kitchen's audits of the legal hold

23  room, Mr. Kitchen testified at his deposition that the Boucher

24  laptop was in the legal hold room.  He testified as follows,

25  Your Honor:  That the laptop was in the legal hold room that he

1   maintains and audits every quarter for our legal team.  And it

2   was one of those laptops in there.  How it got in there, I

3   don't know.

4           And then he goes on and he says -- Mr. Rector asked

5   him:  Okay, and you say you maintain and audit that room.  What

6   does an audit entail for that room?

7           He answered, and this is on page 72 of his deposition

8   transcript:  I'll get a list of teammates, things like that,

9   that are supposed to be in there that are not supposed to be in

10  there any longer, and I audit these -- these rooms and send my

11  findings back to Mike Maryanski and also the legal team.

12          So this is a question, so it's:  Let me make sure I

13  understand that.  It's an audit of those persons who have

14  access to the room?

15          Answer:  No.  It's just an audit of equipment that is

16  in that room.

17          And then he says, in response to a question:  Are

18  there reports of these audits?

19          Mr. Kitchen responded:  Recently, yes.

20          Mr. Rector asked:  Were there in 2019?

21          He says he was not in that role in 2019.

22          And he says:  You got into the role.  Were you aware

23  that reports of that type had been created by Under Armour?

24          No.  He testified that that was something that he

25  initiated.

1          The question:  Is that something that you initiated

2    when you became part of that role?

3          And Mr. Kitchen said:  Yes.  So the process changed

4    when I came into this role.  Instead of it going to security

5    and then going to me and then being held in a room, it would go

6    from the HR directly to me.  It gets held in the legal hold

7    room and gets documented on a sheet.

8          THE COURT:  So let me interrupt you now.  Kitchen

9    testified that as far as he was aware, reports -- he didn't

10   start doing this and start creating reports until when?

11         MS. SMITH:  He started creating reports in 2019, Your

12   Honor, or -- he took on the role in late 2019 and began in late

13   2019 or early 2000 -- I'm sorry.  End of '20, beginning of '21.

14   I'm sorry, Your Honor.

15         THE COURT:  I understand what he said, so tell me why

16   it's relevant and then why you think it does not violate

17   attorney-client.

18         MS. SMITH:  Absolutely, Your Honor.  He testified in

19   response to the question:  So there would be some documentation

20   at the end of '20 or the first of 2021 that shows this Boucher

21   laptop being in that room?

22         Answer:  Correct.

23         Question:  And that hasn't been produced, has it?

24         Answer:  I couldn't answer that question.

25         It hasn't been produced, Your Honor.  And Mr. Kitchen

1    testified that he was the one who initiated this process.  He

2    testified that he --

3              THE COURT:  You don't need -- I'm sorry.  Excuse me,

4    Ms. Smith.  You don't need to read any more of his deposition.

5    In fact, if anyone recalls, I was present and listening to it.

6              So let me ask you something, Ms. Hurney.  Do such

7    reports exist?  Is there a way to produce such reports that

8    would redact everything other than whether Boucher shows up in

9    this room or not, according to Mr. Kitchen's report?  Have you

10   seen one?

11             MS. HURNEY:  Your Honor, if we were to redact the

12   report to only show any reference to Mr. Boucher, we would be

13   redacting the whole report, Your Honor.  Mr. Boucher is not on

14   the list for this spreadsheet.

15             THE COURT:  Okay.  So Boucher does not show up on the

16   spreadsheet which basically Kitchen calls his report?

17             MS. HURNEY:  Yes, Your Honor, that is correct.

18             THE COURT:  And I was listening to his deposition.

19   What I understood that to meant was he has a spreadsheet that

20   says there's 20 laptops in the hold room and it may say who

21   they belong to.  What you're representing to me, Ms. Hurney, on

22   the record, is that there are no reports or spreadsheet that

23   would show that his laptop was in the hold room?

24             MS. HURNEY:  The report does not have Mr. Boucher

25   listed on the hold room, Your Honor.  It does not.  And we're

1     happy to submit that in camera, if you would like to examine

2     it.

3          THE COURT:  Okay.  That's fine.  I'm going to direct

4     you to submit them in camera.

5          And I think that you can assume for purposes of the

6     record, Ms. Smith, that if the Court does not produce them,

7     then Mr. Boucher is not listed on those lists and in the hold

8     room, as represented by Ms. Hurney.

9          So if we do that, Ms. Smith, what else is there left

10    to do in regard to that request?

11         MS. SMITH:  Your Honor, the request was not limited

12    to Mr. Boucher.  It involves Ms. Pajak and her laptop, which

13    also should have been in the legal hold room, although

14    Mr. Kitchen testified with regard to her laptop that it was not

15    in the legal hold room, but it's plaintiff's position that

16    either the presence or absence of the laptops in the litigation

17    hold room is relevant evidence of spoliation the plaintiff is

18    entitled to.  And so without regard as to whether the laptops

19    or a particular laptop is on a particular list at a particular

20    time, it's relevant to plaintiff's claims of spoliation.  The

21    audit list --

22         THE COURT:  I understand your argument.  No.  I

23    understand it.

24         Ms. Hurney, I assume when you send me that, I will

25    not see Boucher's name, or Pajak's, and if I do, I'll provide

1    it to the plaintiff.  Is that correct?

2              MS. HURNEY:  That is fair, Your Honor.

3              THE COURT:  Okay.

4              So Ms. Smith, you will have this record as well as

5    the Court indicating that I've reviewed them in camera and

6    there is no reference either to Pajak or Boucher.  You don't

7    need to know about anyone else.  The other ones are not your

8    case.  And if I tell you that they're not there, then you will

9    then have that evidence.  So what else would you need in regard

10   to those reports?

11             MS. SMITH:  Yes, Your Honor.  That's sufficient.

12             THE COURT:  Okay.  I'm still getting --

13             NATHAN FETTY:  Your Honor, I'm going to see what else

14   I can do.

15             THE COURT:  I lost everyone, by the way.

16             NATHAN FETTY:  Everybody's still here, Judge, on my

17   end.

18             THE COURT:  I'm not seeing them.  There we are.

19             So Ms. Hurney, you will produce those to me, and the

20   Court will review and then report whether Boucher or Pajak are

21   listed.

22             Now, let's go to item number three, talks about Webex

23   Teams chat logs, about efforts to locate Pajak's laptop.  I

24   have a note that those documents -- or there has been a

25   response and they have been produced.

1            Is that correct, Ms. Smith?

2            MS. SMITH:  Your Honor, they have -- the defendant

3    has produced three pages of Webex Team chat notes, Bates

4    Numbered 7368, 7369, and 7370, on Monday of this week.  But

5    that is not sufficient to satisfy the request.  This is a

6    situation where during Mr. Kitchen's deposition he referred to

7    the Webex Team chats in a particular context of a conversation

8    that he had with his boss regarding Ms. Pajak's laptop, I

9    believe, and he identified that it was not through email; it

10   was through a Webex Teams chat.

11           And Mr. Rector asked what the Webex Team chat feature

12   was.  This is on page 98 and 99 of Mr. Kitchen's deposition,

13   and Mr. Rector indicated:  Because we have nothing, not a

14   single chat in the case that's been prepared by Webex Teams.

15   And this is a whole other means of communication that

16   apparently has not been searched in responding to any discovery

17   requests.

18           So Mr. Rector asked later in the deposition,

19   beginning on page 151 and 152, what this Webex Teams chat

20   function was, and discovered that Webex Teams is a system that

21   Under Armour corporate has used for -- has used that system

22   being mid-2020, and that he uses it, Mr. Kitchen uses it, every

23   day; that most employees -- corporate employees of Under Armour

24   use Webex Teams chat because they kind of taught us to use that

25   system and to kind of stay away from email because things get

1  lost in inboxes.  So for corporate teammates the majority of it

2  use Webex Teams or --

3            THE COURT:  Ms. Smith, excuse me.  I understand what

4  Webex is.  We use it here in the federal court system.  It's

5  IM.  It's like internal text messages.

6            Ms. Knecht, I'm sorry about this.  If the echo is

7  bothersome, please remind me and I'll repeat myself.

8            So I understand what it is.  I don't even know if

9  it's capable of being preserved, but first of all, who is Mike

10 Maryanski, Ms. Smith?  Who is Mike Maryanski?

11           MS. SMITH:  I'm sorry, Your Honor.  We're muting our

12 phone between speaking, so it takes me a minute.  I apologize.

13           But Mr. Maryanski, Mr. Kitchen testified, is the

14 person who's an Under Armour employee who he reports to.  So he

15 has a report on the Under Armour side and another one on his

16 HCL side.  If you recall, Mr. Kitchen is embedded.

17           THE COURT:  Okay.  And, of course, you now have

18 Ms. Pajak's computer, which you all are going to do forensic

19 exam on on July 23rd, correct?

20           MS. SMITH:  Your Honor, it is correct that

21 arrangements are being made to travel to Baltimore to view

22 Ms. Pajak's laptop, but that is not sufficient evidence with

23 regard to this spoliation claim.  In the first instance, I

24 believe this is relating to the spoliation of Mr. Boucher's

25 laptop, but Ms. Pajak's laptop was not preserved through any

1  kind of legal hold.  It was not produced or acknowledged that

2  it existed until after the close of discovery.

3          THE COURT:  I'm familiar with that, Ms. Smith.  I do

4  want to ask you some questions about that.

5          First of all, at least from my history with the case,

6  Ms. Pajak was concerned about her employment situation and was

7  communicating with counsel, Mr. Rector, well before her

8  discharge ever happened.  And, in fact, the Court prohibited

9  Under Armour from having any access to those communications

10  between herself and Mr. Rector.

11          I just -- I can't imagine that Ms. Pajak wouldn't

12  have preserved everything on her own computer that would

13  support her claim, and this is her computer.  She would have

14  preserved everything that she felt supported her claim and

15  would have shared it with her attorneys, because they were

16  involved over nine months before she was ever discharged.  And

17  so I don't know what it is you expect to find that she wouldn't

18  have known about in advance.  So can you help me with that?

19          NATHAN FETTY:  Your Honor, before Ms. Smith responds,

20  let me just jump in here about this echo.  It seems to be an

21  issue whenever the courtroom and the Steptoe connection are

22  both unmuted.  So we really need Ms. Smith to be careful about

23  unmuting before it's time to speak.  And in the meantime, Your

24  Honor, I'm trying to -- I'm frantically trying to find somebody

25  from IT to see if we can help things on this end.

1          THE COURT:  And Ms. Smith, I'll be patient to give

2    you time to unmute, so go ahead.

3          MS. SMITH:  Yes, Your Honor.  Thank you.  And I

4    apologize.  We have been trying to stay mute when I'm not

5    speaking.

6          But in the Webex chat, to be clear, I may have

7    misspoke, the Webex chat, three pages that were produced do

8    relate to Ms. Pajak's laptop.

9          But Your Honor, the issue of Ms. Pajak having

10   information on her laptop is separate and apart from the issue

11   of whether Under Armour spoliated evidence in this case, and

12   Judge Keeley very clearly addressed that issue during the

13   hearing on March 4th.  And Judge Keeley -- when Mr. Harrison

14   raised that issue that Ms. Pajak has information, Judge Keeley

15   said that doesn't give Under Armour a pass if they had notice,

16   and they've had notice since June of 2018 that Ms. Pajak has an

17   attorney and was likely to sue them, and they did not preserve

18   the evidence.  That's spoliation on Under Armour's part

19   regardless of the fact that Ms. Pajak had her laptop.

20         Ms. Pajak dutifully gave her laptop back to Under

21   Armour when they instructed her to do so in December of 2018,

22   and despite litigation holds, that laptop, Ms. Hurney just told

23   the Court again, was not placed in a litigation hold room.  It

24   was not preserved.  That's been represented to the Court on

25   multiple occasions.

1          THE COURT:  Ms. Smith, I'm simply raising my hand

2     so -- I would interject, but whenever we're together, we get

3     this echo, so if you can mute yourself now.

4          What I'm going to do on this -- y'all are going to

5     have a forensic examination on Friday of her laptop.  You know

6     what was on there, what you preserved.  I'm simply going to

7     hold a ruling on this motion in abeyance until your forensic

8     examination is done, and your forensic examination may show

9     nothing was deleted and everything is on there that Ms. Pajak

10    knows was on there.  It may very well show that things were

11    deleted that were favorable to her case that she preserved.

12         But I just think it's a bit premature, until you see

13    what the forensic examination of her laptop reveals, and then

14    you have your expert to do so.  I assume if there were things

15    that were favorable to you, you have them and your forensic

16    expert will be able to tell you whether or not there was any

17    efforts -- focused and particularized efforts by Under Armour

18    to remove those things.  So I think it's premature at this

19    time.  I will hold it in abeyance.

20         What I will do, Ms. Smith, if you can -- your

21    forensic expert gives you additional evidence in a report that

22    things that were, for lack of a better word, favorable to

23    Ms. Pajak and her discharge case were intentionally deleted by

24    UA, then I'll look at that report and I may not need to do

25    anything else, because that report may take care of what you

1   need.  But I think I need to see what your forensic expert has

2   to say in that regard.

3           Now, as to -- go ahead and go on about the Webex

4   Teams chat log as to efforts to locate Pajak's laptop.  I want

5   you to go ahead and finish up on that.  I know you got some

6   information, and I want to hear what you have to say about

7   that, Ms. Hurney, so go ahead, Ms. Smith, if you have anything

8   else about the efforts to locate Pajak's laptop.

9           MS. SMITH:  Your Honor, one point of clarification.

10  When you refer to what you term the forensic inspection on July

11  23rd, that's really nothing more than a physical view of the

12  laptop that's scheduled for -- and being scheduled for July

13  23rd.  It's not a forensic examination of the laptop.  I

14  believe that there's been a clone made of Ms. Pajak's laptop

15  and provided to our expert previously, pursuant to the Court's

16  order, and what's to happen on the 23rd is just a visual

17  inspection.

18          THE COURT:  Well, I appreciate and I do recall the

19  reminder about the clone, but the substance is the same.  If he

20  does a forensic examination of the clone and he has any

21  evidence that suggests that something's been intentionally

22  removed from there that you all can show to the Court is

23  relevant or favorable to her case, in your opinion, based upon

24  what you have, then I think you've already made your case in

25  regard to that particular situation.  But I will permit you to

1   explore that once you have your forensic report.  Do you have

2   the forensic report on the clone, Ms. Smith?

3            MS. SMITH:  Sorry.  Took a minute to unmute there.

4   We do not have the forensic report completed on the clone, Your

5   Honor, at this point.

6            THE COURT:  So when you do, then I think this all

7   becomes far less speculative and you may have your questions

8   answered either in a way that's favorable to you or in a way

9   that's not favorable or that's neutral.  But I just think that

10  it's better to see what your forensic reveals in that regard

11  and I can answer that.

12           Now, tell me about Webex.  So some things were

13  provided to you.  Why do you think what was provided is

14  inadequate?

15           MS. SMITH:  Your Honor, the request was for all

16  responsive documents from Webex Teams to the discovery request.

17  What happened during Mr. Kitchen's deposition is we heard of a

18  whole different method of communicating that was not searched

19  throughout any of this responsive -- this discovery.  And

20  that's jarring, Your Honor.  It's a parallel universe that

21  Under Armour is operating under where they are encouraging

22  their employees to communicate not by email, but by Teams --

23  Webex Teams, and before that Cisco Jabber, and they're not

24  searching, apparently, because we have none of this information

25  until they provided the three pages.

1          THE COURT:  Let me ask you this, Ms. Smith:  If your

2     children want to get ahold of you quickly, do they text you or

3     do they send you an email?

4          MS. SMITH:  It depends on the context, but if I had a

5     document request for communications with my children, I'd

6     search both.

7          THE COURT:  Okay.  Mine don't look at emails.  They

8     look at texts.  And I think we're in a time where people

9     just -- it's almost, rather than picking up the phone, they

10    just communicate by -- we have Webex at the court system, and

11    it's our instant messaging.  It's how I communicate with my law

12    clerks.  It's how they communicate with me quickly.  And they

13    know that's a quicker way to get hold of me and talk than

14    sending an email.

15         So I don't -- I say it as a bit of a common practice,

16    but -- and it's a different kind of communication, because it's

17    a quick just kind of conversational communication, as I

18    understand it.

19         So Ms. Hurney, tell me, what have you all provided in

20    that regard, and is there anything else that would -- I wasn't

21    aware that it could be reproduced, quite honestly, but what

22    have you provided and is that everything that you have?

23         MS. HURNEY:  Your Honor, the document that Ms. Smith

24    had been referencing, I don't have the Bates numbers on hand,

25    but the conversation that Mr. Kitchen testified to in his

1  deposition, the conversation between himself and Mr. Maryanski,

2  we have produced that conversation that was referenced in the

3  deposition, Your Honor.  That is a nonprivileged communication

4  and that is, in fact, responsive to prior discovery requests

5  sent by plaintiff.  As a result, we have produced it.

6          If I could make a few points, Your Honor.

7          THE COURT:  Go ahead.

8          MS. HURNEY:  Your Honor, Ms. Smith made this point:

9  Webex Teams, as Mr. Kitchen testified in his deposition, came

10 into being it sounds like in 2020, so after the litigation had

11 commenced.  So Webex Teams chats wouldn't exist prior to 2020,

12 just because the company wasn't using it at that point, Your

13 Honor.

14         And to the reference to, I believe, Cisco Jabber, we

15 recently had the opportunity to depose Ms. Pajak, and when

16 asked the sorts of programs that she used in her job, she

17 didn't list any sort of additional communication programs or

18 software, which leads to my third point.

19          Mr. Kitchen had testified in his deposition that he

20 sees corporate employees use Webex Teams as a means for

21 communication.  There is a distinction to be had between

22 corporate employees and retail employees, Your Honor.  At UA

23 that means something.  Retail folks are out in the field.  They

24 work in the store.  They're boots on the ground.  Corporate are

25 those that are in the corporate location, Your Honor.  That is

1   my understanding.

2           I do believe there's a distinction to be made between

3   Mr. Kitchen's testimony about corporate employees commonly

4   using this sort of messenger feature.  It's probably convenient

5   for them when they're not on the road.

6           THE COURT:  What did you provide to Ms. Smith?

7           MS. HURNEY:  Your Honor, there is a series of

8   messages between Steven Kitchen and Mike Maryanski, who he

9   reports to on the Under Armour side, Your Honor, and that was

10   regarding the Pajak laptop, and I believe the communications

11   took place in May of 2021.  That is what he testified to in his

12   deposition.

13           THE COURT:  Okay.  And that's where the efforts were

14   trying to locate Pajak's computer, right?

15           MS. HURNEY:  Yes.

16           THE COURT:  Okay.  So back to you, Ms. Smith.  I

17   mean, I think that's what you wanted, which is what's going on

18   between Maryanski and Kitchen as to trying to locate this

19   laptop, so what's insufficient?

20           MS. SMITH:  Your Honor, I believe Ms. Hurney just

21   told you in a roundabout way that Under Armour has done nothing

22   whatsoever to review either Webex Teams chats or Cisco Jabber

23   for responsive information regarding Ms. Pajak's discovery

24   request, despite the fact that many of the people who are

25   involved here are, in fact, corporate, Mr. Toner, Mr. Boucher.

1    Many of the people involved in this litigation and who have the

2    responsibility to provide responsive documents are, in fact,

3    corporate.  And regardless, there has been no effort whatsoever

4    to search these relevant chains of communication and to provide

5    responsive information.

6            The fact that they so readily had these three pages

7    and this looks like it just -- it begins on May 4th at 11:01

8    a.m., and it ends, three pages of it, on May 5th.  It's one

9    day's worth that was provided to us between Mr. Kitchen and

10   Mr. Maryanski.  Clearly they're using the Webex Teams chat, and

11   this needs to -- we were taken aback when we found that there

12   are whole other means of communications that were not searched

13   at all with the discovery responses here.

14           It's another indication it took them very little

15   time.  Mr. Kitchen volunteered that responsive information was

16   on these -- on this method of communication that we don't use,

17   we didn't know anything about.  But communications broadly

18   certainly were requested in the discovery request, and

19   certainly the Rules of Civil Procedure require that those means

20   of discovery are communications that must be searched.

21           THE COURT:  It's an interesting -- I understand your

22   argument.  I'm not convinced I accept it, but I have to think

23   about it.  I can tell you, I mean, for example, when I want to

24   communicate with my law clerk, I don't pick up my phone.  I

25   don't dial his extension and wait for it to ring and he answers

1   it.  It's a quick, I need this, and he responds, and it's the

2   quickest way of communication.

3          And so it's certainly not the formality of an email

4   or other things, and so I don't -- I'm not reading into it what

5   you are.  And plus, it's a relatively new means of

6   communication that they've been using, and sort of text.  And I

7   don't want to call it text, but it's just sort of very internal

8   communication.

9          But I think -- let me understand from Ms. Hurney, I

10  mean, as far as you know, are there any other communications

11  between Maryanski and Kitchen about trying to locate Pajak's --

12  or is this what happened in trying to locate Pajak's laptop,

13  what you've shared with them and what you've provided?

14          MS. HURNEY:  This is all we're aware of between

15  Mr. Kitchen, Mr. Maryanski regarding the location and the

16  efforts to locate the Pajak laptop, Your Honor.

17          THE COURT:  Okay.  I don't know what else to say,

18  Ms. Smith, other than they have now given to you what are the

19  communications.

20          MS. SMITH:  May I, Your Honor?  The first

21  communication is, I have Pajak's laptop.  So that's the

22  beginning of it.  Not efforts to locate it.  That's the

23  beginning.  That's the first one, 5-4-2021, at 11:01.  I have

24  Pajak's laptop.

25          THE COURT:  And that's what Kitchen is saying, or

1   Maryanski?

2          MS. SMITH:  I'm sorry, Your Honor.  That was

3   Mr. Kitchen to Mr. Maryanski, it appears.  So we need to know

4   what came before that.  That's clearly not the beginning.

5          THE COURT:  Hold it there.

6          Now, Ms. Hurney, what about that?  I mean, do you

7   have anything before the 5-4-2021 communication?  It does sound

8   odd we would just start out, I have it.  Was a request made to

9   look for it, and when?

10         MS. HURNEY:  Your Honor, those are the only chats

11  we're aware of that discuss the Pajak laptop.  What I would

12  assume, Your Honor, is that there were communications by email

13  that have either already been produced in this case because

14  they are nonprivileged and, in fact, responsive to the prior

15  request by plaintiff, or they are privileged communications

16  that are including UA's in-house legal counsel or external

17  counsel regarding the laptop, but we have produced this part of

18  the chat -- this is the only chat we're aware of that has to do

19  with Ms. Pajak's laptop.

20         THE COURT:  Okay.  I understand the argument.  And I

21  understand yours, Ms. Smith.  I have looked at the emails in

22  camera that had to do with legal assistants and people in the

23  legal department attempting to locate these laptops, and the

24  only thing in there, as I've represented before in writing in

25  my order, was simply mere logistical attempts to locate the

1   laptops, nothing else, just back and forth about trying to

2   locate them and that's it, nothing to suggest any argument that

3   would support hiding anything or any spoliation claims, at

4   least what was produced to me in camera, which I understand was

5   the emails, and I've ruled on that.

6          So let's -- in addition, you've had the opportunity

7   to depose Kitchen at length.  I sat in on most of it.  And

8   after hearing that, there are a number of things.  Kitchen is

9   just kind of the keeper of these things.  He gets involved.

10  They finally find her laptop and -- at a late date, and you all

11  now have it and you've had the opportunity to look at it, but I

12  just -- I haven't seen anything that would suggest, other than

13  people trying to find these things, and I get the argument that

14  why didn't it happen quickly, where was it.  And I understand

15  that.  But I don't know what else to say with it.

16         I understand your argument that you want them to

17  produce what Webex text Teams chats they have.  I'll take that

18  under advisement.

19         Let me ask Ms. Hurney one question.  In terms of just

20  proportionality and reasonableness, are these things easily --

21  I know it's a relative term.  Are they easily produced and

22  stored, or what's your understanding?

23         MS. HURNEY:  I'm not sure, Your Honor.

24         THE COURT:  Okay.  Who would know that?

25         MS. HURNEY:  Mr. Maryanski would know, Your Honor.

1   We can inquire.

2                 THE COURT:  He's the tech guy; is that correct,

3   Ms. Hurney?  Is Mr. Maryanski a tech guy who's Mr. Kitchen's

4   supervisor?

5                 MS. HURNEY:  Yes, Your Honor.

6                 THE COURT:  Okay.  I think I've heard what I needed

7   to on that issue, and I'll make my ruling.

8                 Let's go on to number four, Ms. Smith, list of all

9   devices, IDed by serial number or similar identifier, used by

10  Boucher.  So why don't you go ahead and tell me your argument

11  in that regard.

12                MS. SMITH:  Yes, Your Honor.  This issue came up in

13  the testimony of Mr. Kitchen when he indicated -- actually, it

14  came up in the context of learning for the first time during

15  this deposition of Mr. Kitchen that, in fact, Mr. Boucher had a

16  whole other laptop for most of the relevant time period here.

17  That was, again, quite shocking.

18                But Mr. Kitchen testified that Mr. Boucher had a

19  laptop through the -- I believe it was November of 2018 that

20  was stolen from an airport in Bogota, Colombia.  Despite all of

21  the hearings on these issues beginning back in January of 2020

22  regarding Ms. Pajak's motion to inspect Mr. Boucher's devices,

23  it's never been explained to the Court that Mr. Boucher had a

24  laptop for most of the relevant time period and it was stolen,

25  a few weeks before Ms. Pajak was terminated, from an airport in

1   Bogota, Colombia.

2         And so in the context of telling Mr. Rector how

3   Mr. Kitchen locates devices or can tell what devices have been

4   issued to someone, Mr. Kitchen testified that there is

5   something called Absolute, and that Absolute could find all of

6   someone's devices.  He testified on page 170 to 172 with regard

7   to the context and how he found Mr. Boucher's devices, what had

8   been issued to Mr. Boucher on Absolute, and he testified on

9   pages 223 to 225 as to exactly what Absolute is and the fact

10   that Absolute can -- you can run reports off of Absolute which

11   give you lists of laptops issued to people, including Brian

12   Boucher, but not limited to him.  You can just plug that in and

13   can do it by serial number.  It can do it by Under Armour issue

14   number.  It was the first thing that Mr. Boucher looked for to

15   find Ms. Cynthia Pajak's laptop in February of 2021.

16        THE COURT:  Okay.  Ms. Smith, let me interrupt you

17   now, because I want to speak to Ms. Hurney.

18        I mean, Ms. Hurney, can Under Armour produce simply

19   an inventory of maybe six items that was issued to --

20   electronic items that was issued to Mr. Boucher during his

21   employment?  I mean, is it as simple as running it off of this

22   program, Absolute, print it off, and said when he started, he

23   had a laptop, an iPad, a phone, he lost an iPad, got another

24   one.  I mean, seems to me that should be able to be done as to

25   what devices he had that were issued and then what he returned.

1    Can Under Armour do that?

2           MS. HURNEY:  Your Honor, the program that's being

3    referenced, the software that plaintiff has brought up called

4    Absolute, that's a software program installed only on laptops,

5    PCs, and Macs.  Other devices used by Mr. Boucher wouldn't be

6    picked up by Absolute, so as a result, we couldn't use that for

7    all devices that Mr. Boucher had.

8           THE COURT:  Are you able to, in a -- just simply an

9    interrogatory response or say on the record what devices were

10   issued to him, or is Under Armour unable to say what devices

11   were issued to their employees?

12          MS. HURNEY:  We could respond to an interrogatory

13   regarding Mr. Boucher's devices, Your Honor, yes.

14          THE COURT:  Well, I don't know -- I'm trying to

15   see -- yes, I'm directing you then to respond to the

16   interrogatory, which is what devices were listed to him, and

17   identify them with as much particularity as you can.

18          So does that answer that question, Ms. Smith?

19          MS. SMITH:  Yes, Your Honor, if they provide that

20   information.

21          THE COURT:  Okay.  Thank you.

22          Now, what about this chain-of-custody form?  Has that

23   been taken care of?

24          MR. HARRISON:  Your Honor, I apologize.  I don't mean

25   to interject and prolong this, but in terms of responding to

 1   that interrogatory, can we get a time period, please?

 2           THE COURT:  How much time would you need?

 3           MR. HARRISON:  I just mean the scope of --

 4   Mr. Boucher was employed by Under Armour for several years.

 5   How far back --

 6           THE COURT:  You mean not the time within which to

 7   provide it.  I just think we talk about the -- what devices he

 8   had at the -- let me ask you, Ms.  -- when did Mr. Boucher --

 9   when was he first employed?  Ms. Hurney, when was he first

10   employed with Under Armour?

11           MS. HURNEY:  Your Honor, Mr. Kaminski could probably

12   correct me.  I want to say it was around 2015, Your Honor, I

13   believe.

14           THE COURT:  And so Ms.  -- what do you consider the

15   relevant time period, Ms. Smith?  I know when the lawsuit was

16   filed.  I think we should have a reasonable time period before

17   it, but what time period are you suggesting or requesting,

18   Ms. Smith?

19           MS. SMITH:  2017, Your Honor.

20           THE COURT:  Okay.  Let's just make it January 1,

21   2017, to his discharge.

22           MR. HARRISON:  Your Honor, if I might, all the

23   allegations in the amended complaint refer to actions and

24   activities that took place in 2018.

25           THE COURT:  Ms. Smith, why wouldn't January 1, 2018,

1  be the appropriate date?

2           MS. SMITH:  Your Honor, because he could have a

3  laptop that was issued in 2017 and 2018, or a phone or an iPad.

4           THE COURT:  They are going to indicate, January 1,

5  2018, what laptop he had.  Could have been issued to him in

6  2015.  But I want to know the devices he had as of January 1,

7  2018.  Is that helpful, Mr. Harrison?

8           MR. HARRISON:  (Indicates thumbs up.)

9           THE COURT:  How much time will you need to respond to

10  that, do you think, Ms. Hurney?

11           MS. HURNEY:  A week would be sufficient, Your Honor.

12           THE COURT:  Okay.  I'll direct you to do so within a

13  week.

14           So let's go on to the chain of custody.  Did you have

15  anything else to say about that, Ms. Smith?

16           MS. SMITH:  No, Your Honor.

17           THE COURT:  I'm sorry.  Has that been provided?

18           MS. SMITH:  Yes, it has.

19           THE COURT:  Okay.  Good.  So that's number five.

20           Number six, I have a lease return spreadsheet.  I

21  understand that that has been produced; is that correct,

22  Ms. Smith?

23           MS. SMITH:  Your Honor, they produced several pages

24  that they purport to include a lease return list.  I suppose

25  that's adequate.  I'm not sure what it is yet.  It's just a

 1   list of numbers.

 2           THE COURT:  Well, that may be what a lease return

 3   spreadsheet looks like, but I'll give you an opportunity, if

 4   you think that's insufficient, to make an additional request,

 5   but at this time Under Armour has represented it has been

 6   produced, it's what they have, and so upon your review, if

 7   there's something you believe otherwise, then that will be my

 8   holding.

 9           Now, number seven, there's documents, emails,

10   communications showing why Pajak's laptop was in the lease

11   return bin instead of on a legal hold.  I don't want you to say

12   anything about that.  I first want to hear from Under Armour.

13   I was listening to Mr. Kitchen's deposition in particular in

14   that regard when they found it in a lease return bin.

15           Ms. Hurney, are there any documents, communications,

16   emails, as to how it ended up in the bin?

17           MS. HURNEY:  Your Honor, we have not located any

18   responsive documents or communications that are nonprivileged

19   that would answer that question.

20           THE COURT:  And what -- I mean, are there

21   communications between lawyers or paralegals explaining how it

22   ended up in the lease bin?

23           MS. HURNEY:  There is communications with counsel,

24   Your Honor, on the subject.

25           THE COURT:  Okay.  Well, I want you to produce those

1   to the Court in camera, please.

2            MS. HURNEY:  Yes, Your Honor.

3            THE COURT:  Okay.  I'm going to review those,

4   Ms. Smith, and then I'll issue an order in that regard and go

5   from there.

6            The in camera deadlines that I've talked about,

7   Ms. Hurney, is a week going to be enough for you?

8            MS. HURNEY:  Yes, Your Honor, that would be

9   sufficient.  Thank you.

10           THE COURT:  Okay.  Thank you.  So that will be the

11  28th.

12           Now, number eight, the updated privilege log,

13  Ms. Smith, showing when emails were sent to Kitchen regarding

14  locating Pajak's and Boucher's devices, indicates to me that UA

15  has supplemented this and it's no longer in dispute.  Again,

16  that's what my summary indicates.  Is that correct or is that

17  not correct, or is there something more to it, Ms. Smith?

18           MS. SMITH:  Your Honor, we would request that any of

19  the documents that have been discussed today be added to that

20  privilege log as well.  As far as we know, it's been

21  supplemented, but it's a continuing effort and it's important

22  that we have access to the privilege log.

23           THE COURT:  My understanding is, Ms. Hurney, you have

24  provided the updated privilege log; is that correct?

25           MS. HURNEY:  Yes, Your Honor.  The communications

 1    between Steven Kitchen and counsel, and whether in-house or

 2    external, have been placed on the privilege log, yes.

 3                THE COURT:  And Ms. Smith already has those?

 4                MS. HURNEY:  (Nods head.)

 5                THE COURT:  Is that correct?

 6                MS. HURNEY:  I believe so, Your Honor.

 7                THE COURT:  Okay.  So were you identifying something

 8    else, Ms. Smith?  I mean, it's represented that you have that.

 9                MS. SMITH:  Specifically, Your Honor, I was referring

10    to the documents that you were just discussing Ms. Hurney to

11    provide to the Court in camera.  I don't believe -- to my

12    knowledge, those have not been placed on a privilege log, so

13    what I was referring to was the documents specifically we're

14    referring to today or any continued supplementation.

15                THE COURT:  I know that we talked about Pajak's

16    laptop and why it was in the lease return bin instead of being

17    on legal hold, that perhaps some communications that you're

18    asserting, Ms. Hurney, are attorney-client privilege.  To that

19    extent, I want to see those documents as well as a privilege

20    log supporting it.  Does that make sense?

21                MS. HURNEY:  Yes, Your Honor.

22                THE COURT:  Okay.  Is that what you were getting at,

23    Ms. Smith?

24                MS. SMITH:  Yes, Your Honor.

25                THE COURT:  Okay.  So I see there's a number nine on

1   my list, which says all emails or other communications from

2   UA's legal team to Kitchen instructing him to locate Pajak's

3   and Boucher's devices.  So tell me why you believe that that's

4   not attorney-client and I should order that be produced,

5   Ms. Smith.

6           MS. SMITH:  Absolutely, Your Honor.  Mr. Kitchen

7   testified that his relationship with Ms. Finck was such that

8   she was not giving him legal advice or instructing him legally;

9   that all of the communications that they had were simply, as

10  Your Honor said during the deposition and here today as well,

11  logistical.  And those logistical communications are critical

12  to Ms. Pajak's time line and her understanding of what happened

13  with regard to the efforts to preserve evidence and the

14  spoliation of evidence, quite frankly.

15          But Mr. Kitchen testified during his deposition that

16  his relationship with Ms. Finck was not a legal one, that there

17  was no legal advice given, that it was simply logistical.  And

18  Your Honor recognized that during the hearing and made some

19  rulings during the hearing that if the -- during the

20  deposition, that if the objections of Under Armour and

21  Mr. Walls are taken to the extreme, Ms. Pajak would be entitled

22  to nothing, and in fact, that's the nature of the objections.

23  There are objections at every turn to everything we asked for

24  and we believe that we're entitled to the documents that show

25  what the directions were.  I think that that's consistent

1   with --

2        THE COURT:  Here's what I'm going to rule on that.

3   Ms. Hurney, to the extent that there are any documents as -- or

4   emails between Mr. Kitchen and -- my recollection, I can't

5   think of the paralegal who he said he met with who said -- who

6   was basically giving him some directions as to what to look

7   for.  He did it and she wrote it down and then he signed the

8   declaration.

9        So Ms. Hurney, if there's any other communications to

10   Kitchen that would advise him as to what he was to do in

11   looking for things on that device, I would direct you to submit

12   those to me in camera, and then I can determine whether they're

13   logistical, attorney-client.

14        And my understanding is that's pretty minimal; is

15   that correct, Ms. Hurney?

16        MS. HURNEY:  I believe so.  And I think the Court may

17   have already examined some of these emails when Mr. Walls

18   provided emails to the Court in camera.

19        THE COURT:  And I may have.  I mean, I -- I recall

20   looking at this type of emails, which were short, cryptic, and

21   really logistical about just finding things.  But if that's --

22        Ms. Hurney, if they've already been produced, would

23   you simply produce them again in camera to just say, Judge,

24   these are the communications, and then I can take a look at

25   those and discern whether there's any violation of

1   attorney-client privilege or whether it's outside of the scope

2   of that.  And then -- can you do that all within a week,

3   Ms. Hurney, on that list?

4            MS. HURNEY:  Of course, Your Honor.  Thank you.

5            THE COURT:  Okay.  Now, I think in regard to ECF

6   Number 466, Ms. Smith, that I've addressed everything; is that

7   correct?  And if not, please let me know.

8            MS. SMITH:  Your Honor, I believe that's it, Your

9   Honor.

10           THE COURT:  Okay.  Thank you.

11           So certainly, Ms. Hurney, if you can get those things

12  sooner, that's wonderful.  I know you all have a hearing before

13  Judge Keeley on August 10th, and I certainly want to have my

14  rulings done in a time so that you have the benefit of those

15  and to express your disagreement with those before Judge

16  Keeley.  Certainly she'll have the final say on it.

17           Okay.  I now want to -- Mr. Fetty, as far as you're

18  concerned, are we okay on ECF 466?

19           NATHAN FETTY:  Yes, sir, Your Honor.

20           THE COURT:  Okay.  Thank you.

21           Now, let's go to ECF 430.  Looks like, Mr. Harrison,

22  you're stepping up, so you're going to handle that one?

23           MR. HARRISON:  Yes, Your Honor, if you don't mind.

24           THE COURT:  Now, this has to do with the 30(b)(6)

25  depo, and I see that United -- I'm sorry, Under Armour has

 1    objected to certain topics identified, so with that, let's talk

 2    about topic nine, Mr. Harrison.  I'm going to try to give the

 3    outline of what I think is appropriate under the 30(b)(6), and

 4    I'll certainly give you the opportunity, Ms. Smith, to help me

 5    consider whether I missed anything from your perspective.

 6            So I understand, Mr. Harrison, that you consider it

 7    too broad and also see where you've talked about there are some

 8    things that you anticipate that your representative could talk

 9    about, so do you want to explain that to me?

10            MR. HARRISON:  Yes, Your Honor.  And so what we're

11    coming up against in this case and the recent discovery

12    disputes is what type of evidence does plaintiff believe has

13    been spoliated in this case.  In her amended complaint, she

14    identifies three categories of information that form the basis

15    of her spoliation theory.

16            And the Court may already be familiar with this, but

17    the three categories are My Game Plan, HR Analytics, and text

18    messages from Brian Boucher.  Now, Under Armour certainly can

19    produce a witness to explain the existence or nonexistence of

20    information regarding My Game Plan, the existence or

21    nonexistence of information related to HR Analytics.  No

22    objection to doing that.  It's identified in the complaint.  We

23    understand that's at issue.

24            As for why Mr. Boucher's texts are no longer

25    available, I don't think it makes sense to have Under Armour

1    produce a designee to testify about that.  Mr. Boucher is the

2    one who testified he may have deleted the text messages towards

3    the end of his employment.  If plaintiff wants to find out why

4    those text messages are no longer available, I think the

5    inquiry should go to Mr. Boucher, not to Under Armour through a

6    30(b)(6) witness.

7              And so those are the three categories that I wanted

8    to address.  The problem I have with the original topic as

9    described by plaintiff, it's overly broad.  And, I mean, let me

10   put it in context for you.  We have tried very hard to have

11   plaintiff identify for us in discovery what evidence she

12   believes is missing.  We had a phone call with opposing counsel

13   this morning pursuant to the Court's order, and we're at

14   loggerheads a little bit as to plaintiff's obligation to

15   disclose what evidence she believes is missing so that we can

16   wrap up discovery on this case.  And this topic goes to that.

17             The only evidence identified in the complaint are

18   these three categories.  We're prepared to go forward with a

19   30(b)(6) on two of the three.  We don't think Under Armour

20   should have to produce a witness to explain why Mr. Boucher may

21   have deleted text messages near the end of his employment.

22             THE COURT:  Sure.  So, I mean, Ms. Smith, I want to

23   hear what you have to say, but I really don't know -- how do

24   you respond to a question that says all evidence about what

25   evidence no longer exists.  I don't know how you answer that.

1  So I certainly am going to permit you to question their

2  representative about My Game Plan, about HR Analytics.  It does

3  appear that all the allegations have to do with Boucher, who's

4  a defendant in this, and to that extent, at least, I understand

5  you've had a pretty exhaustive deposition of Boucher, but he's

6  a named party.  It seems that that is the best way to handle

7  that.

8          So tell me if you have anything with particularity

9  other than My Game Plan and the HR -- I mean, that this

10  witness -- this witness can come prepared to answer.  I mean,

11  to say all evidence, I think, Ms. Smith, is just too broad.  So

12  go ahead.

13          MS. SMITH:  Your Honor, thank you.

14          First, I want to be very clear, because this issue

15  of -- which is just a red herring, has come up time and time

16  again in these discovery disputes, and it just has to be

17  dispelled.

18          In the motion for leave to amend the complaint,

19  Ms. Pajak did not in any way, shape, form, or fashion, as

20  Governor Justice famously says, limit herself to the three

21  topics that Mr. Harrison just identified.  And at the hearing

22  on March 4th, Ms. Williams made it clear that Ms. Pajak's

23  claims of spoliation go beyond those three categories that

24  Mr. Harrison has continually tried to pigeonhole her into.

25          THE COURT:  Slow down, Ms. Smith.  We really got to

1    back off the editorialization, counsel.  The reason for this,

2    Ms. Smith, is that I don't want to have a witness there who's

3    going to say -- you're going to say all evidence and he's going

4    to say, this is only what I can speak to.  And I don't know how

5    you get a Rule 30(b)(6) witness without some specificity to be

6    able for them to produce to answer your questions.  So that's

7    the practical matter I have.

8              And so if you can identify some things with

9    particularity rather than saying all, then that will be helpful

10   to the Court.  And that will give us some direction as to who I

11   will tell them to produce and how to answer those questions.  I

12   mean, does that make sense, Ms. Smith?

13             MS. SMITH:  Yes, Your Honor.  We'll be happy to

14   provide a list.

15             THE COURT:  Okay.  Well, can you do it now and let's

16   talk about it, because I haven't found much agreement between

17   the parties.

18             MS. SMITH:  Your Honor, there are a number of items

19   that have been spoliated.

20             THE COURT:  Here's what I'm going to do on that,

21   Ms. Smith.  I want you to email that list to the Court.  Can

22   you get that to me before the end of business tomorrow?  I want

23   you to copy Mr. Harrison.  Then I'll give you an opportunity --

24   and send a list to Mr. Fetty.  Copy Mr. Harrison.  And I want

25   as much specificity as you can.

 1          And then in that regard, Mr. Harrison, I understand

 2    you're arguing about the three things listed.  If there are

 3    other things that are specific, I will want you to indicate to

 4    the Court your objection, and then I'm just going to say in

 5    that regard what your witness has to be able to testify to, to

 6    the best of their knowledge.  And if there is no evidence, then

 7    your person can say that.

 8          So are you able to do that by the end of the day

 9    tomorrow, Ms. Smith?

10          MS. SMITH:  Yes, Your Honor.

11          THE COURT:  Okay.  And then I'll give you till the

12    end of the following Monday.  Would that work for you,

13    Mr. Harrison?

14          MR. HARRISON:  (Indicates thumbs up.)

15          THE COURT:  Which would be July 26th, the end of

16    business, to respond.

17          MR. HARRISON:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          Now, I'm just going to go right to topic ten.  I

20    mean, what -- I mean, it seems -- topic ten, it seems to me,

21    Ms. Smith, that -- what does Sarbanes-Oxley have to do with

22    this?  And so if you're talking about recordkeeping, what is it

23    in particular that you're talking about?  I mean, there's no

24    fraudulent accounting or reporting or financial things, so what

25    recordkeeping are you talking about and what kind of questions

1    do you want to ask in that regard?  So tell me that.

2            MS. SMITH:  Okay.  Your Honor, under Sarbanes-Oxley,

3    publicly traded companies have to certify document controls,

4    and they have to have systems in place for document controls,

5    and Mr. Catzen, the defendant's expert, has testified with

6    regard to that.  Well, Under Armour has represented to Judge

7    Keeley that they have no policies with regard to that, these

8    issues, when the issue came up previously in a hearing.  And

9    these are relevant lines of inquiry because of the fact that

10   Under Armour's publicly traded and subject to Sarbanes-Oxley.

11           THE COURT:  Mr. Harrison.

12           MR. HARRISON:  Your Honor, just to correct the record

13   here today, Under Armour has record retention policies.  What I

14   told the Court on March 4th is that Under Armour did not have a

15   written record of retention policy for HR records.

16           THE COURT:  Okay.

17           MR. HARRISON:  That's true today.  That doesn't mean

18   we don't have protocols.  That doesn't mean we don't have

19   processes.  And if plaintiff wants to inquire about those

20   protocols or processes, or why there's not something in writing

21   in terms of personnel records or HR records, that's fine.  I

22   don't understand the Sarbanes-Oxley piece.  We're going to need

23   some more specification.

24           Plaintiff was employed in West Virginia.  Are we --

25   if we're going to look at what state requirements for

 1   preservation of HR records, are we going to look at West

 2   Virginia, or are we going to look at Maryland, where Under

 3   Armour is based?  Are we talking about OSHA records?  Are we

 4   talking about payroll records?

 5          I give you some context for this.  I've been asked

 6   repeatedly during my practice to provide record retention

 7   schedules for employers.  There are different time frames that

 8   we recommend and suggest, depending upon the type of

 9   information.  And that basically goes to how long employers and

10   maybe other types of entities have to keep certain types of

11   records.  These things are going to vary.

12          And this may be apples and oranges, but just to give

13   you an example in health care.  In health care, employment

14   records might be maintained for two years.  Payroll records

15   might be maintained for five years.  The medical records are

16   going to be maintained maybe 18 or 20.  And OSHA has a

17   different set of requirements.

18          So I think we're entitled to a little bit more

19   specification here from plaintiff, what type of state and

20   federal requirements is she referring to.  Can she identify

21   them specifically so that we can properly prepare a witness.

22          But I will tell you this, and this issue isn't really

23   before the Court.  We've given a preview of it.  We deposed

24   plaintiff on June 22nd, and she was unable to identify any

25   information that was supposedly missing from My Game Plan,

1    which is the human resources information system.  She was

2    unable to identify any information from that system that should

3    have been produced that hasn't been produced in this case.

4    And, in fact, she contradicted one of the key allegations in

5    her complaint, which is that Under Armour failed to produce

6    midyear performance evaluations for 2017 to 2018.  She

7    testified that the process had changed and those were no longer

8    reduced to writing.  And so this feels like an academic

9    exercise in the abstract.  I just want to put that out there.

10           But if plaintiff can provide us with specification on

11   what she needs by whatever state or federal or regulatory

12   requirement she's referring to, we can tee off that.

13           THE COURT:  So certainly I think it is, and I don't

14   think that Under Armour disputes that you can talk to them

15   about certainly they have someone there as to how they maintain

16   or what their protocols are and policy is in regard to human

17   resource records.

18           Are you looking at something broader than that,

19   Ms. Smith?  And if so, in particular what, and then tell me

20   why.

21           MS. SMITH:  Your Honor, we're looking for obviously

22   the records retention policies with regard to -- and their

23   compliance in particular.  This is their compliance with state

24   and regulatory obligations.  They know what state and

25   regulatory obligations --

1              THE COURT:  Well, you shouldn't assume that.  I mean,

2      god, there are lots of states and federal regulations.  So, I

3      mean, you have to have someone there who can ask those.  And, I

4      mean, it's a broad question just to tell me how do you comply

5      with all state and federal regulations.  That's -- there's just

6      so many things.

7              So, I mean, this is an employment discrimination

8      case.  I think the focus needs to be on what's relevant in an

9      employment discrimination case.  And in particular that the

10     allegation is that she was discriminated against because, I

11     believe, her sex and age.  So I just -- why would anything

12     outside of that be relevant?

13             MS. SMITH:  Your Honor, to clarify, this is a

14     retaliation claim --

15             THE COURT:  Well, okay.

16             MS. SMITH:  -- by Ms. Pajak, but in answer to your

17     question, while human resources is certainly relevant here and

18     we would expect that type of information, it's been testified

19     to that -- or represented by Mr. Harrison that Under Armour has

20     no retention policy for anything other than emails.  He

21     represented that to Judge Keeley very broadly.

22             And with regard to the nature of this case, their

23     retention policy with regard to all of these devices that we've

24     been talking about is also critical.  The litigation hold, the

25     legal hold room, and all of the devices that we've been

1    discussing, laptops, iPads, phones, and their retention of

2    those and the information on them.

3            THE COURT:  And I agree with that.  And I think

4    that -- Mr. Harrison, I think we talked about it earlier.  I

5    expect you all to have someone who can testify as to their

6    policy and procedures as to what do you do when you get a legal

7    hold.  What are your policies and protocols.  Are they written.

8    No.  Then what are they and how do people understand them and

9    then they can list them.  I think that's extremely relevant and

10   I'd certainly permit them to ask that, Mr. Harrison.

11           In regard to the keeping of employment files as it

12   has to do with someone's employment, I mean, not their medical

13   records or benefits or anything like that, I mean, this is an

14   employment claim, a retaliation claim, and but I understand it

15   to be a retaliation claim based upon how she felt they were

16   treating women; is that correct, Ms. Smith?

17           MS. SMITH:  Yes, Your Honor.

18           THE COURT:  Okay.  So I can just tell you that if

19   you're going to ask a question about all state and federal law

20   and what your policy on records retention, I'm going to

21   overrule it, just saying that it's too broad.  If you're going

22   to ask about what your HR -- well, what are your HR policies

23   and protocols in regard to when you get put on notice of a

24   potential litigation, they will answer that.  What do you do

25   then with those devices.  Where are they placed.  How's that

1   kept track of.  How are those -- how are those items preserved.

2   That's certainly appropriate.  So you know what their policy

3   and protocol is.

4          And if the person answers, there's no written, this

5   is our policy and protocol, then that's their policy and

6   protocol.  Whether that's a good idea or not, that's for

7   someone else to decide.

8          I just -- I don't see getting outside of that,

9   Ms. Smith, as being relevant, but maybe there's something else

10  that is particularly relevant that I'm missing.  I mean, does

11  that sound fair in your line of questioning of them, and

12  Mr. Harrison will have someone who's able to answer that?

13         MS. SMITH:  Yes, Your Honor.

14         THE COURT:  Okay.  And again, Mr. Harrison, in

15  particular because it is -- the additional discovery is

16  spoliation, it has to do with her employment, the records of

17  her employment, her performance, those things that have to do

18  with the meat of a retaliation claim based upon her being a

19  female, in essence, a sex discrimination claim also, and an

20  employment claim.

21         And then in particular because it seems to me in

22  following this, how are certain things preserved, policy and

23  procedures, and you'll have that person there who will be able

24  to produce, if there is written, you'll produce it; if there's

25  not, what their policy and protocols are.

1              Is that helpful, Mr. Harrison?

2              MR. HARRISON:  Absolutely.

3              THE COURT:  Okay.  Let's go -- again, on topic

4    eleven, this whole what's their obligations and requirements

5    for record retention as a publicly traded company, my goodness,

6    if this was a shareholders' litigation suit, I might think

7    that's relevant, but did I cover earlier, I think, the areas

8    that you think you need to get into, Ms. Smith?

9              MS. SMITH:  Your Honor, if they do have obligations

10   as a publicly traded company, we have a right to ask about

11   that.  If they don't do anything to comply with those, then

12   they can answer that question.  But we should be able to ask --

13   and the same thing back -- this relates back to Sarbanes-Oxley.

14   They have requirements under Sarbanes-Oxley.  If they don't

15   want to testify to it, we have the right to ask them, I

16   believe, how do you comply with the statute.

17             THE COURT:  This is where you're not answering my

18   question.  How is Sarbanes-Oxley, how is record retention as a

19   publicly traded company, how is that relevant to your

20   particular case and the allegations in your case?  They can

21   tell you what their policy and protocols are and what's in

22   writing.  If you later determine that it's not in compliance

23   with Sarbanes-Oxley or publicly traded company and you think

24   that's relevant at trial and the trial court permits it in,

25   then that's their business, but this is an employment case and

1   it's a retaliation case, and so it's not bigger than that.

2           And so, I just -- I mean, I'm asking for help,

3   Ms. Smith, but if you all keep making it broader, then you've

4   made it real easy for me.  I'm going to keep it narrow, because

5   I just see no reason Sarbanes-Oxley and publicly traded

6   company, again, if you want to make an argument to the Court

7   that, you know what, Your Honor, the fact that they don't have

8   a written policy in regard to retaining certain records is in

9   violation of federal and state law in regard to publicly traded

10  companies, you can make that argument.  But this is about

11  facts, your client, and information that they have in regard to

12  her, and it's an employment retaliation case and that's the

13  focus of it.

14          I just can't see getting outside of that.  And so if

15  you all start to do so, just -- I don't know how much more I

16  can say as to what I think is relevant context and to your

17  questioning.

18          So let's go on to number 12.  Plaintiff seeks

19  testimony, all actions taken by Steven Kitchen in making his

20  sworn statement.  I think, Ms.  -- I know -- I don't know about

21  the timeliness.  I know you've taken his deposition.  Seemed to

22  be a thorough deposition.  I don't know what anyone has to add

23  other than what he said in regard to his communications with

24  lawyers and others.  I've taken that under advisement.  I'm

25  going to review those documents, but is there anything else

1    about that topic 12 and Kitchen that you wanted to identify,

2    Ms. Smith?

3              MS. SMITH:  That's sufficient, Your Honor.

4              THE COURT:  Okay.  Thank you.

5              It seems to me I've already ruled on topic 13 and the

6    declaration of Olson on these -- when I ruled about the

7    subpoena issues.  Do you think I've -- did I resolve that?  I'm

8    not saying in a way that anyone agrees with, but did I resolve

9    it?  Do you believe so, Mr. Harrison?

10             MR. HARRISON:  Your Honor, not exactly.  So what you

11   did resolve were the subpoenas that were served upon JND,

12   Olson, and Ben Sexton, and those were document production

13   subpoenas.  The order that you issued actually has a carve-out

14   as to to what extent there may be a dispute about Olson's

15   deposition.  Plaintiff has requested Olson's deposition.  If

16   plaintiff wants to depose Olson about the facts that support

17   her declaration, we have no objection to that, and we've been

18   consistent about that, I believe.

19             I've recently inquired of plaintiff's counsel what

20   other topics they want to ask her about, because that may butt

21   up against some of the rulings you've made, so I would like

22   to -- which hasn't been provided yet, but assuming Olson's

23   deposition goes forward and plaintiff inquires of her regarding

24   what efforts she made, her efforts described in the

25   declaration, I don't know why Under Armour has to provide a

1   30(b)(6) testimony to duplicate that.

2          THE COURT:  Okay.  So tell me, Ms. Smith, your

3   position on that.  I think I did discuss that if -- that you

4   would have the opportunity to depose Olson, if you so desired,

5   again, about the logistics and the process as to how she came

6   about providing the declaration that she made.  So what is it

7   you would want of a 30(b)(6) that would not be duplicative?

8          MS. SMITH:  Well, to begin with, Your Honor, a

9   30(b)(6) deposition is different because it's testimony -- it's

10  broader in its testimony that binds the company.  Questioning a

11  particular witness who was involved in something on an

12  individual level is different, frankly.

13         THE COURT:  So what are you going to want to ask this

14  30(b)(6) about Olson?

15         MS. SMITH:  Well, Your Honor, I believe that asking

16  about the context of the declaration, how it came to be that

17  Ms. Olson was asked to prepare the declaration, and all of the

18  context around it.  One of the stumbling blocks that we've run

19  into, Your Honor, in many of these areas with regard to,

20  frankly, the Kitchen deposition -- or declaration, the Olson

21  declaration, is this issue of, just go ask Under Armour.  Now

22  we're asking Under Armour, and it's, just go ask Ms. Olson.

23         But we have a right, frankly, Your Honor, to ask both

24  and to get the perspective of the person who did the

25  declaration and the context from the Under Armour

1  representative who's binding the company.

2          THE COURT:  So Mr. Harrison, you're going to need to

3  have someone, a 30(b)(6), prepared to how was it that Olson

4  came about to be asked to prepare this declaration and what was

5  the expectations in that regard.  It's not too big of a

6  question.  And they should be able to handle it.  That's my

7  ruling on that.

8          Topic 14, I don't know.  Where are you going on topic

9  14 about something that Mr. Harrison said on the record,

10 Ms. Smith?

11         MS. SMITH:  Yes, Your Honor.  And that goes to the

12 information that's been provided to us all along with regard to

13 Mr. Boucher's devices and during hearings being represented to

14 the Court that Mr. Boucher did not rely on his laptop.  I

15 believe that was a reference at the time to the laptop that was

16 spoliated and eventually produced for inspection in, I believe,

17 February, without any regard to the fact that, in fact, he did

18 rely on his laptop.  It goes to the Kitchen deposition and

19 declaration.

20         THE COURT:  I understand that, but I think that whole

21 statement was made when we were talking about the laptop, but

22 since then I've permitted you all to inspect the laptop.

23 You've had your own forensic evaluation about it.  I don't know

24 how you ask a 30(b)(6) question to a company representative

25 about what Mr. Harrison represented to the Court.  It just --

1   just not articulated that way.  Mr. Boucher can ask whether he
2   relied on his laptop.  And I'm sure you all thoroughly deposed
3   Mr. Boucher.  But why is that a 30(b)(6) issue?  I don't think
4   it is, so --
5            MS. SMITH:  Your Honor --
6            THE COURT:  Go ahead.
7            MS. SMITH:  I'm sorry.  If you asked a question, I'll
8   answer it.  I wasn't unmuted.
9            THE COURT:  I'm sorry.  So you were unable to hear
10  me?
11           MS. SMITH:  No.  I heard you, Your Honor, ask the
12  question, I believe, of why that was a Rule 30(b)(6) issue.
13           THE COURT:  So if you would answer, please.
14           MS. SMITH:  Yes, Your Honor.  It's a Rule 30(b)(6)
15  question, Your Honor, because it goes to litigation conduct,
16  and it goes to the issue of representations during litigation,
17  and litigation misconduct, frankly, and Under Armour's
18  involvement in litigation misconduct, making representations to
19  the Court during the course of litigation that clearly are
20  false at the time that they're made.
21           THE COURT:  Okay.  So give me an example of what you
22  would ask a 30(b)(6) witness in regard to what you're saying to
23  me right now.
24           MS. SMITH:  Sure, Your Honor.  And I would ask if
25  they were -- first, to start off, if they were aware that

1   Mr. Harrison had made that representation to the Court.  And

2   I'd ask in follow-up what facts were known to them at the time

3   Mr. Harrison made that representation to the Court.  And I'd

4   ask them what they had done to confirm or deny whether

5   Mr. Harrison, in fact, relied on his laptop.

6               THE COURT:  Okay.

7               MS. SMITH:  I'm sorry.  Mr. Boucher relied on his

8   laptop, Your Honor.

9               THE COURT:  I've heard enough.

10              You want to say anything about that, Mr. Harrison?

11              MR. HARRISON:  No, Your Honor.  I think we've talked

12  about this issue enough.

13              THE COURT:  Yeah.  That's not Rule 30(b)(6), and I'm

14  not going to permit it, and my order will indicate that.

15              Topic 15, plaintiff seeks testimony as to factual

16  basis for counsel Grace Hurney's statement.  I'm not going to

17  permit you to talk about topic 15.  Again, I don't know why

18  y'all are so tempted to continue to cross this line into what

19  is attorney-client information, and I just -- I don't

20  understand it.

21              Now, in regard to questions about the presentation of

22  the laptop once there is a litigation hold, how that is

23  documented, what their policy and procedure are, you can ask

24  all those things and you will have a corporate rep who will

25  answer them.  And you are permitted to do that.

1          Now, let's go to topic 16, litigation hold as to

2     Pajak laptop, again, of a 30(b)(6).  You can talk about the

3     process when there's a litigation hold, so if there is a

4     litigation hold, would it have affected Pajak's laptop.  Yes.

5     Would it have affected Boucher's.  Yes.  And what's your policy

6     and procedure and what happened.  And I'm sure, as we all know,

7     that Pajak's laptop wasn't in the litigation hold room.  And

8     they can say when it was discovered and what their policy and

9     procedures are in that regard.

10          But you have it.  You're going to have -- you have

11     the -- you're going to be able to do a forensic evaluation on

12     it, and certainly you have the right to ask about the process

13     as to how they handle devices once there's a litigation hold,

14     what's their policies and procedures, and that's very

15     appropriate, and whether they were followed in this case.

16     That's very appropriate.

17          And you'll have someone prepared to answer that,

18     correct, Mr. Harrison?

19          MR. HARRISON:  Yes, Your Honor.

20          THE COURT:  Okay.  I will also -- in regard to topic

21     20, I'm going to permit you to ask the Under Armour

22     representative what, if any, policy they have once someone

23     leaves their employment as to the deletion of items on their

24     personal devices.  And they can answer whether they have a

25     policy and procedure or whether, to the best of their

 1   knowledge, Boucher followed that or did not.

 2             Now, I understand in regard to topic 22,

 3   Mr. Harrison, that you said you will provide a witness who will

 4   answer why Boucher's iPhone was not inspected.  As to whether

 5   or not there's a duty to inspect, that's for someone else, but

 6   certainly, Ms. Smith, you can ask the 30(b)(6), did Mr. Boucher

 7   have a phone?  Yes.  Was it inspected at the time of the

 8   litigation hold or at the time he left his employment.  If

 9   their answer is no, you can ask why.  If the answer is yes, you

10   can ask, what are the results of that inspection.  I think it's

11   for the Court, a jury, to conclude what that means, either

12   failure to inspect the iPhone, and for the Court to conclude

13   whether or not, if that iPhone was not inspected, has to do

14   with spoliation.  It's a factual question.  It's factual

15   evidence that I think you have a right to find out.

16             All the legal conclusions, Ms. Smith, are ones you

17   make after you have your facts, but I'm going to let you ask

18   about the phone.

19             You understand that, Mr. Harrison?

20             MR. HARRISON:  Yes, Your Honor.  And I don't have any

21   problem with how you've articulated or characterized the scope

22   of the inquiry.  And I hate to be so nit-picky about the words

23   we're using here, but it's -- the way these 30(b)(6)

24   depositions go, if a witness is not prepared to testify about

25   one word that's in the topic, then accusations fly, so that's

1  why we challenged that topic.

2          THE COURT:  No.  I understand.  And that's why I'm

3  doing my best to add clarity.

4          MR. HARRISON:  Thank you.

5          THE COURT:  So tell me about topic 27, Ms. Smith.

6  The plaintiff seeks testimony of a designee as to UA's failure

7  to retain investigative files.  What are you referencing?

8          MS. SMITH:  Your Honor, we're referring to HR files

9  in this case related to the complaints of a witness who has

10 been deposed with initials MD, and who had made complaints, and

11 we understand that the records were destroyed, so we need to

12 know about the investigative files, when the records were

13 destroyed, and who ordered their destruction.

14         THE COURT:  So Mr. -- why don't you tell me your

15 position on that, Mr. Harrison.

16         MR. HARRISON:  Yes, sir.  So this requires a little

17 bit more explanation and review.  I think Ms. Hurney touched on

18 this back in January of 2021.  We were having some other

19 discovery disputes regarding this.

20         So to review, MD is a store manager for an Under

21 Armour retail location in Clarksburg, Maryland.  In January of

22 2019, she relayed concerns about behavior she saw in the store.

23 Those concerns were eventually relayed to Ms. Pajak.  Under

24 Armour does not dispute that MD relayed concerns.  MD testified

25 that she could not recall whether she prepared a -- any kind of

1  statement or document relative to that incident.  And so

2  there's nothing for Under Armour to produce, because we don't

3  believe anything existed in terms of documentation.

4        And we provided a little bit of explanation to that

5  to plaintiff earlier in this case.  One of the HR

6  representatives who was involved with that situation signed a

7  declaration that explained her interactions with Ms. Pajak, so

8  we don't believe -- and we've looked, but we don't believe an

9  investigative file exists for the episode that's identified in

10 the amended complaint that MD testified about.

11       The problem here is this topic not only addresses

12 that incident; it goes beyond it.  So MD testified in her

13 deposition that she experienced problems, was treated

14 inappropriately by other employees, by Under Armour, several

15 years ago, I think 2013, 2014, maybe.

16       During discovery, plaintiff has attempted to obtain

17 the investigative files related to those incidents.  We have

18 been unable to locate or identify those files and, frankly, the

19 people who are involved with that are no longer at Under

20 Armour, so it's been sort of difficult to figure out why those

21 files no longer exist, assuming they did.

22       But my point is bigger than that.  We're going really

23 far back in time and reaching really down -- we're going far

24 away in time and far away in scope in terms of plaintiff's

25 allegations.  I don't know why Under Armour -- I don't think

 1   it's relevant.  I don't know why Under Armour has to produce a

 2   witness to testify about the absence of investigative files

 3   that are completely and wholly unrelated to plaintiff's

 4   allegations.

 5          Plaintiff wasn't involved in the incidents that MD

 6   testified about in '13 or '14.  Boucher was not involved.  The

 7   people who were involved are no longer at Under Armour.  MD

 8   testified that she left Under Armour and came back.  So it's

 9   not impacting MD's employment.  It's not something that

10   plaintiff advocated about in 2018.  It's not material to the

11   claims in the case.  So that's my spiel.

12          THE COURT:  But let me ask this, though.  I mean,

13   does Under Armour have policy and protocol as to when a

14   complaint is made, an investigation is held, as to the

15   preservation of those files?  And maybe their policy is once

16   they find no cause, they're destroyed.  Whether that's a good

17   policy or not, I don't know, but I mean -- and the reason I'm

18   asking that is, you know, there's discovery about spoliation

19   and the issue becomes whether or not there's some --

20          MR. HARRISON:  Nothing was spoliated here.  Under

21   Armour isn't going to dispute -- doesn't challenge the fact

22   that MD raised concerns about these incidents.

23          THE COURT:  Okay.

24          MR. HARRISON:  So I think that kind of bears on this.

25   I don't know ultimately if they're going to be admissible at

1    trial, and I know we'll save that -- but Under Armour does not

2    dispute that MD had these concerns in '13, '14, in 2018.  We've

3    made that clear to plaintiff for months.

4            THE COURT:  And have they also made it clear that

5    there's no files to share in regard to those disputes, they're

6    gone?

7            MR. HARRISON:  We have, Your Honor.  We've looked

8    very hard.  I cannot speak to the policies and protocols that

9    were in place and used by HR representatives in '13 and '14.

10   Things have changed since then.

11           THE COURT:  And will your 30(b)(6) be able to say

12   exactly what you represented, we don't know what they were

13   then, today that's not the case, and we can't explain why they

14   no longer exist?

15           MR. HARRISON:  Well, but we can't even explain

16   whether they actually existed, so it's sort of asking us to

17   follow up -- disprove a negative, in a way.

18           THE COURT:  I understand.  Did you want to say

19   anything else about that, Ms. Smith?  I'm going to think about

20   it, but I want to hear what Ms. Smith has to say.

21           MS. SMITH:  Your Honor, Ms. MD gave -- testified in

22   her deposition that she gave a statement, and Ms. MD left Under

23   Armour's -- Ms. Pajak was aware of Ms. MD and aware that Ms. MD

24   had given a statement regarding improper treatment to HR and

25   from an HR person, the bad behavior.  This is evidence of prior

1    bad acts by Under Armour, even to the HR department.

2             Ms. MD made a statement.  Ms. MD was employed by

3    Under Armour until December of 2019, at which point she

4    testified in part because of the behavior that she received

5    from Under Armour.  And so, Your Honor, it's very relevant here

6    to Ms. Pajak's claims of spoliation of evidence that the

7    information with regard to this complaint have not been

8    produced.

9             THE COURT:  Okay.  I understand the argument.  And I

10   do get that -- I understand perhaps -- is it your argument

11   number one Mr. Harrison, what does it have to do, any of those

12   arguments, with spoliation in Ms. Pajak's claim, correct?

13            MR. HARRISON:  Correct.

14            THE COURT:  And then I'm understanding your argument,

15   Ms. Smith, I think what it is that -- I think what you're

16   wanting to suggest is that when there are these types of

17   claims, the investigative materials turn up -- they're not

18   preserved and so they're -- that's -- and that was intentional,

19   and so that's just evidence of their conduct here; is that

20   correct?

21            MS. SMITH:  Yes, Your Honor.

22            THE COURT:  Okay.  I understand the arguments.

23   Everyone, we kind of stuck these on at the end.  I'm done for

24   today.  I know we still have ECF 431 and 432 outstanding.  What

25   I'm going to do is I don't mind imposing upon you all to stay

1    around so we can get some dates to reschedule, if I believe we

2    need them.  Because a lot of this argument starts to overlap

3    and I think I understand things.

4          But at this point in time what I'm going to do is go

5    off the record, adjourn, and all I'm going to be discussing

6    with counsel are dates to schedule additional hearings, if

7    necessary, on the two remaining motions referred to the Court.

8          Mr. Harrison, did you want to say something before I

9    do so?

10          MR. HARRISON:  Please.  I apologize, Your Honor.  By

11   agreement of counsel, the attorneys, the parties in this case,

12   have agreed to refer to certain individuals by initials.  I

13   almost -- in referring to MD, I almost said out loud her full

14   name a few minutes ago.  I would ask and make a motion to the

15   Court, if necessary, if the court reporter can modify the

16   transcript.

17          THE COURT:  I will grant your motion and I will

18   direct that the court reporter -- and I did catch that for

19   Mr. Harrison.  I know it was unintentional.  The reference will

20   be MD and MD only.  And to the extent that the court reporter

21   heard a name, I am directing the court reporter not to report

22   that in a transcript if it's -- or to report that at all.

23          Does that make sense, Ms. Knecht, and is that an

24   appropriate way to handle it for you?  So I'll direct you to do

25   so.

1          Was there anything else you wanted to say,

2     Mr. Harrison?

3          Nothing further, we shall be adjourned.  You all hang

4     on on Zoom and you'll talk.

5          (Proceedings adjourned at 5:01 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2          I, Cindy L. Knecht, Registered Professional Reporter and

3     Official Reporter of the United States District Court for the

4     Northern District of West Virginia, do hereby certify that the

5     foregoing is a true and correct transcript of the proceedings

6     had in the above-styled action on July 21, 2021, as reported by

7     me in stenotypy.

8          I certify that the transcript fees and format comply with

9     those prescribed by the Court and the Judicial Conference of

10    the United States.

11         Given under my hand this 26th day of July 2021.

12                    /s/Cindy L. Knecht
                      _____
13                    Cindy L. Knecht, RMR/CRR
                      Official reporter, United States
14                    District Court for the Northern
                      District of West Virginia
15

16

17

18

19

20

21

22

23

24

25