IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYNTHIA D. PAJAK

    Plaintiff,

V.                              CIVIL ACTION NO.: 1:19-cv-160
                                    JUDGE: KLEEH

UNDER ARMOUR, INC.,
UNDER ARMOUR RETAIL, INC.,
AND BRIAN BOUCHER

    Defendants.

**DEFENDANT BRIAN BOUCHER'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Brian Boucher, by counsel, Scott H. Kaminski, Franki L. Parsons and Ray, Winton & Kelley, PLLC, pursuant to Rule 56 of the Federal Rules of Civil Procedure and moves this Court for an Order granting summary judgment in his favor as to all issues and claims as Plaintiff has failed to raise genuine issues of material fact that would prevent this Court from ruling as a matter of law.

Boucher adopts and joins in the Motion for Summary Judgment filed by Under Armour, Inc. and Under Armour Retail, Inc. as well as the Memorandum of Law in Support Thereof and Statement of Facts contained therein.  In the interests of brevity and judicial economy, Boucher submits the contemporaneously filed Memorandum of Law in Support of his Motion for Summary Judgment with respect to those issues

1

pertinent to him, being 1) the applicability of the West Virginia Human Rights Act, W.Va. Code §5-11-1 et seq. ("WVHRA") to Plaintiff's claims against him as a "person" where the WVHRA is not applicable to their employer and 2) Plaintiff's claim of Intentional Spoliation of Evidence against Defendant Boucher.

Boucher joins co-Defendants Under Armour, Inc. and Under Armour Retail, Inc. (collectively referred to as "UA") as to all issues save one. Defendants' path on this issue diverges only because the Supreme Court of Appeals of West Virginia decided on April 22, 2022 that Plaintiff's claims against UA under the WVHRA fail to meet the numerosity requirement of the WVHRA, employing fewer than twelve employees within the state of West Virginia. Relative to the applicability of the WVHRA to Boucher, the Supreme Court of Appeals of West Virginia declined to opine. The applicability of the WVHRA to Boucher is ripe for summary judgment at this time.

In addition, Boucher expands upon UA's argument relative to Plaintiff's Intentional Spoliation of Evidence claim as it pertains to Boucher. Plaintiff has failed to prove that Boucher failed to preserve evidence related to her claims or that he intentionally deleted information not otherwise available and relevant to her claims. See Ex. 1, Boucher Depo.

Accordingly, for the reasons set forth herein as well as in Under Armour, Inc. and Under Armour Retail, Inc.'s Motino

for Summary Judgment and Memorandum of Law in support thereof, and in Boucher's Memorandum of Law in Support to his Motion for Summary Judgment filed contemporaneously herewith, Brian Boucher respectfully requests that this Court grant summary judgment in his favor.

>                              BRIAN BOUCHER
>
>                              By Counsel

s/Scott H. Kaminski
Scott H. Kaminski (WVSB#6338)
Ray, Winton & Kelley, PLLC
109 Capitol Street, Suite 700
Charleston, WV 25301
304-342-1141
ScottKaminski@rwk-law.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CYNTHIA D. PAJAK

    Plaintiff,

V.                                     CIVIL ACTION NO.: 1:19-CV-160
                                       JUDGE KEELEY

UNDER ARMOUR, INC.,
UNDER ARMOUR RETAIL, INC.,
AND BRIAN BOUCHER

    Defendants.

## CERTIFICATE OF SERVICE

        The undersigned counsel hereby certifies that on 1st day of August, 2022, he served a true and correct copy of the foregoing DEFENDANT BRIAN BOUCHER'S MOTION FOR SUMMARY JUDGMENT via CM/ECF which will send electronic notice to the following counsel of record:

                        Robert M. Steptoe, Jr.
                        Larry J. Rector
                        Amy M. Smith
                        Allison B. Williams
                        Dylan T. Hughes
                        Steptoe & Johnson PLLC
                        400 White Oaks Boulevard
                        Bridgeport, West Virginia 26330
                      **Counsel for Plaintiff**

                        Justin M. Harrison
                        Jill E. Hall
                        Grace E. Hurney
                        Laura Ann Hoffman
                        Jackson Kelly PLLC
                        500 Lee Street, East, Suite 1600
                        Post Office Box 553
                        Charleston, West Virginia 25322
                    **Counsel for Under Armour, Inc. and Under Armour Retail, Inc.**

        Amy Estelle Askew
        Kramon & Graham, PA
        1 South St., Suite 2600
        Baltimore, Maryland 21202
         **Counsel for Under Armour, Inc. and Under Armour Retail, Inc.**

s/Scott H. Kaminski
_____
Scott H. Kaminski (WVSB#6338)

# In The Matter Of:

*CYNTHIA PAJAK v.*
*UNDER ARMOUR, ET AL*

*BRIAN BOUCHER*
*Vol. II*
*July 30, 2021*

*Reedy Court Reporting*
*304.615.6725*

Original File 07-30-2021 0805 Friday brian boucher vol 2.txt
Min-U-Script® with Word Index

**EXHIBIT 1**

Page 427

1 lawyers told the Court that you had deleted 7,000 text
2 messages from your iPhone. Do you have any idea when
3 you deleted those text messages, Mr. Boucher?
4   A. I mean, I deleted text messages my entire time
5 at Under Armour. To think that I know the totality of
6 what those are, it's -- I don't. I mean, it's -- you
7 know, I received, sent, and deleted text messages for
8 the entire three years that I was there. So I have no
9 idea what that reference point or what time frame or
10 anything that was a reference about that.
11   Q. Okay. We showed you information before which
12 indicated that you received Under Armour's litigation
13 hold on February 26. Do you think you deleted 7,000
14 text messages between February 26 and March 15 of 2019?
15   A. No.
16   Q. When I first took your deposition on November
17 20, you provided some inconsistent testimony and I just
18 want to give you an opportunity to revisit that today to
19 make sure we're on the same page about this. You made
20 reference to Under Armour wiping data from your phone,
21 so my question to you, Mr. Boucher, is: Do you have any
22 reason to believe that on March 15 anyone at Under
23 Armour did anything to modify data on your iPhone?
24   A. Absolutely not.

Page 428

1   Q. During the course of this lawsuit, your
2 counsel has made some representations to the Court about
3 what you physically did with the phone after March 15;
4 and it's my understanding based upon information that
5 counsel has shared that at some point in time you
6 actually returned the iPhone to Under Armour.
7   A. That's correct.
8   Q. I'd like to know a little bit more about that.
9 How did that come about?
10   A. You had referenced the last day of employment
11 that I had met with Jeanne Desisko (sic) to -- as part
12 of my exit interview of where I turned in all of my, you
13 know, credit card and equipment as you had mentioned.
14 And during that meeting, I had asked to keep my phone
15 for a period of a couple of weeks until I received a new
16 phone. And so there was a document that I had to sign
17 and she, you know, granted me the ability to keep the
18 phone to be able to use for phone calls and whatnot.
19       And so she had sent me emails probably
20 about a week or two after that checking in on had I
21 received my new phone, and I had and responded that I
22 had and I was dropping off -- going to return the phone
23 to Under Armour which to their station house on the main
24 campus to the security desk to her attention.

Page 429

1   Q. So if I understand you correctly, Mr. Boucher,
2 it's your testimony that a week or so after your
3 employment ended at Under Armour you had an email
4 exchange with Ms. Cordisco about returning your phone to
5 Under Armour?
6   A. Correct.
7   Q. Why would Ms. Cordisco or Under Armour want
8 your phone back?
9   A. It was their phone. They purchased the phone
10 for me. They just -- you know, they allowed me to port
11 the number but not keep the phone so -- and I was
12 getting a new phone anyway.
13   Q. You have a specific and clear recollection of
14 having that email exchange with Jeanne?
15   A. I do.
16   Q. Do you still have that email?
17   A. I do not.
18   Q. That would have been sent from your personal
19 email address?
20   A. It would have, yes.
21   Q. You said you returned to I think the reference
22 you used was station house?
23   A. Yeah, the check-in desk at the main campus
24 where all visitors go.

Page 430

1   Q. Who did you return the phone to?
2   A. There's a security person there.
3   Q. Do you remember the name of the individual you
4 handed the phone to?
5   A. I don't.
6   Q. Was the phone in a box or a wrapper or any
7 type of packaging?
8   A. No, I think I just turned in the phone and
9 put, you know, whether it be a Post-it or some note that
10 said to the attention of Jeanne Desisko and notified
11 that individual that that's who it was for.
12       MR. RECTOR: Mr. Harrison, I'm not going
13 to interrupt you now, but whenever it's a good time to
14 take a break, we've been going about an hour.
15       MR. HARRISON: Yeah, give me a second.
16 Thank you.
17       MR. RECTOR: Sure.
18   Q. Mr. Boucher, do you have any documentation or
19 notes that relate to your return of the phone to Jeanne?
20   A. Any documentation or notes, no. I mean -- no.
21   Q. Aside from Jeanne, did you tell anyone else at
22 Under Armour that you would be returning the phone?
23   A. No. There would be nobody else to tell. My
24 exit interview was with her and she's the one that

### Page 451

1  secure the iPhone. She then testified that she then
2  called you and asked you to turn around. I think she --
3  this part I will confess I'm not 100 percent
4  recollection on. I think she said that you were already
5  in your car departing the complex, and she asked you to
6  turn around to return the iPhone and she -- her words
7  were quite clearly you -- frankly your attorney asked
8  her to characterize it was hesitant and she did not do
9  that. She said you were resistant.
10  A. She did not ask me to return -- again, to be
11  clear, when she did -- and she could be correct that she
12  called me. I was just departing the building. I
13  thought she chased me down in person. If she called
14  when I was in my car, I had asked her what it was -- she
15  said, hey, Melissa Miller was trying to get in touch
16  with me while I was doing the exit interview with you.
17  She wants you to get in touch with the legal team. And
18  I said, What is this regarding? Do you know what this
19  is about? She said, No, I do not. She never mentioned
20  anything about the iPhone. Never mentioned anything
21  about anything other than I needed to call them.
22      So there was never any conversation
23  between her and I about me turning around or turning in
24  the iPhone or doing anything. It was only that I needed

### Page 452

1  to get -- the legal team needed to speak with me before
2  I left the campus.
3  Q. Okay. You seem, again, certain in your
4  testimony in that regard. Is that fair?
5  A. Yes.
6  Q. And, frankly, I know you haven't had the
7  benefit of seeing her testimony or reading her
8  transcript, but she was equally certain in her
9  testimony. If that's the case, then what do you make of
10  that?
11  A. I don't know why she would testify to
12  something that didn't transpire. And, further, there
13  would be no reason why I wouldn't have -- if they wanted
14  to take my phone for whatever reason, I would have
15  turned it in. I went over and turned it into the legal
16  department. If she had requested, I would have turned
17  it in to her. There's no hesitation. There would have
18  been no reason other than I needed phone service. I
19  didn't have another phone set up. That was the only
20  reason that I needed to retain the phone and there would
21  have been no time I hesitated whatsoever to do that.
22  Q. Now, before you turned in your laptop, you
23  deleted data off the laptop, didn't you?
24  A. Sure. Yes.

### Page 453

1  Q. -- and you deleted data knowing that the
2  laptop was one of the devices subject to the litigation
3  hold issued on February 26, 2019 --
4  A. Yes.
5  Q. Why would you delete data off the laptop
6  knowing that was subject to a preservation obligation?
7  A. Because all of the information with regard to
8  Ms. Pajak I had turned over to Mr. Toner in December and
9  confirmed that I had turned over every piece of
10  correspondence that I had with regard to Ms. Pajak.
11  When I received the litigation hold on the 26th of
12  February, I, once again, went to Mr. Toner and confirmed
13  that, hey, I received this litigation hold. Just want
14  to confirm with you that I turned in everything with
15  regard to Ms. Pajak to you. He concurred.
16      And so any other thing that I would have
17  deleted or got rid of did not have anything to do with
18  Ms. Pajak. It was regarding other Under Armour business
19  that -- or projects or information that didn't have
20  anything to do with Ms. Pajak.
21  Q. You deleted the Kristen Gladcowski text from
22  your phone, didn't you?
23  A. I deleted those as they were happening.
24  Q. Did you -- you received -- sent and received

### Page 454

1  pictures from Ms. Gladcowski; is that right?
2  A. Well, when you say sent, I don't recall
3  sending her pictures. I recall receiving pictures from
4  Ms. Gladcowski.
5  Q. Did you preserve any of those pictures that
6  you received?
7  A. I did not.
8  Q. I think your lawyer has through some
9  questioning suggested that Ms. Gladcowski sent you
10  pictures of her in a bikini; is that right?
11  A. She was on vacation with girlfriends of hers
12  in South Carolina, and had sent me a picture of her on
13  vacation with -- on a beach.
14  Q. Other picture? Did she send you other
15  pictures?
16  A. Yeah, of floor sets or new product or some
17  other things that she shared that I recall that she sent
18  me pictures of.
19  Q. And you deleted all of those pictures that she
20  had sent you over the course of the exchanges with her?
21  A. I did.
22  Q. Is it your testimony that you didn't delete
23  any of those in March of 2019?
24  A. I didn't delete any of those in March of 2019.

### Page 459

1  A. Correct.
2  Q. Now, you surrendered your laptop and your iPad
3  to Ms. Cordisco on the 15th; correct?
4  A. Correct.
5  Q. Sorry. I couldn't hear you.
6  A. Correct.
7  Q. Are you aware that Under Armour has never been
8  able to produce anything on that iPad or the iPad itself
9  in this case?
10 A. I never set up the iPad with my Under Armour
11 email or anything. I never used the iPad, so I would
12 assume that there's -- I never set it up with anything,
13 that I never used it, so I'm not surprised that there is
14 none. I never set it up for use at work. I had it, it
15 was issued to me, but I never utilized it while there.
16 Q. I understand your testimony that you never
17 utilized it. My question a is a little bit different.
18 You had surrendered that iPad to Under Armour; correct?
19 A. Yes.
20 Q. Under Armour then logged it into evidence
21 under a chain of custody form, and I'm going to show you
22 that form. We're -- that is Under Armour 7371 and just
23 let me know when you've had a chance to review it,
24 Mr. Boucher.

### Page 460

1  A. (Reviews document.) Okay.
2  Q. I had used the term that Under Armour had
3  logged it into evidence; right?
4  A. Yes.
5  Q. That's a fair characterization of what this
6  represents, isn't it?
7       MR. HARRISON: Objection. Calls for
8  speculation.
9       MR. KAMINSKI: Object to the form. You
10 can answer if you know.
11 A. I've never seen this form, but it -- the title
12 says, Description of evidence, so it's -- I agree with
13 your assessment of it, yes.
14 Q. Okay. This form under description of evidence
15 lists one iPad; correct?
16 A. Correct.
17 Q. So you surrendered the iPad. That much we
18 know. They actually logged it into evidence. Are you
19 aware that they have never been able in this case to
20 actually physically produce this piece of evidence that
21 they logged into their own evidence room?
22      MR. KAMINSKI: Let me object to form of
23 the question. I'm not sure the witness can answer
24 without divulging information he's learned from his

### Page 461

1  counsel. If you can answer that question, Brian, based
2  on information you learned from someone other than
3  myself, you may answer if you --
4  A. Yeah. Mr. Rector, I just want to be clear.
5  Are you asking me if I am aware that they logged the
6  iPad into evidence but they have not been able to
7  produce the iPad after logging it into evidence?
8  Q. Yes, sir.
9  A. I'm not aware of that.
10 Q. Okay. This other piece of evidence in this
11 case, the first item which is UA I believe that's PC.
12 You see that?
13 A. Yes.
14 Q. I'll represent that corresponds to the laptop
15 they did produce in case. You're aware, aren't you,
16 sir, that Under Armour had one of its contractors look
17 at your laptop to see what was on it?
18      MR. KAMINSKI: Again, let me interpose
19 an objection to the extent that I'm not sure the witness
20 can answer without divulging information he's learned
21 from his counsel. Mr. Boucher, you can answer the
22 question to the extent that you had knowledge responsive
23 to Mr. Rector's question that you did not learn from me.
24 A. I was not aware.

### Page 462

1  Q. Okay. I think there was discussion of the
2  laptop during the March 4 hearing with Judge Keeley that
3  you participated in. Do you not recall that?
4  A. I recall the hearing. If you can remind me of
5  the -- I don't recall something specific to my laptop,
6  but she or somebody could have referenced it.
7  Q. Okay. There's a contractor of Under Armour
8  named Steven Kitchen, an IT contractor. He's been
9  deposed in this case and he testified that there were
10 vast amounts of data that were deleted from your laptop
11 before it was surrendered. Would you agree with that
12 characterization if that's his testimony?
13 A. Yes. I mean, in my last week of employment
14 there and, you know, cleaning up files and transitioning
15 work to other people to the organization and giving --
16 as I mentioned earlier that, yeah, I did clean and
17 delete and transfer and sent information to people that
18 would have been relevant to. So, sure, I would have
19 cleaned up and organized and deleted stuff at that time
20 during that last week.
21 Q. There's been testimony in the case that we're
22 talking about significant amounts of data, entire
23 folders, emails, documents that were deleted. Would you
24 agree that's what you did that last week?

**Page 463**

1   A.  Yes. As I had mentioned earlier, the way that
2   I organized was I used Outlook folder, so as trans -- if
3   the information was no longer relevant to, you know,
4   work that I had done or I had forwarded it to other
5   people that were going to be taking over that work, I
6   would have deleted both the content within those folders
7   and probably the folders themselves.
8   Q.  You knew that that laptop was under a
9   preservation obligation at the time that you were doing
10  that, didn't you?
11  A.  I had received as we talked about before the
12  litigation hold and confirmed that every information
13  with regard to that hold that I had forwarded to the HR
14  department and Mr. Toner. So, yes, I was aware of the
15  litigation hold, but nothing that I was working on,
16  deleting or transferring or sending had anything to do
17  with that litigation hold.
18  Q.  I understand that's your testimony, but my
19  point is you knew that that device was under a specific
20  preservation obligation and yet with that knowledge you
21  deleted content from that device; isn't that true?
22       MR. KAMINSKI: I'm going to object to
23  the form of the question to the extent that calls for a
24  legal conclusion. You may answer.

**Page 464**

1   A.  I knew that I was responsible for maintaining
2   or for preserving any information, correspondence,
3   documentation, et cetera, with regard to Ms. Pajak which
4   I had stated that I had done and forwarded on to
5   Mr. Toner. So there was nothing that I was working on,
6   sending, deleting or getting rid of that had anything to
7   do with my understanding of the litigation hold with
8   regard to preserving information and evidence for --
9   regarding Ms. Pajak.
10  Q.  Prior to deleting all that data from your
11  laptop, did you ever reach out to anybody at Under
12  Armour to ask guidance given that you were aware of a
13  litigation hold?
14  A.  No.
15  Q.  So you deleted stuff off the laptop your last
16  week of employment that was under a litigation hold
17  without then seeking guidance from anybody at Under
18  Armour legal with regard to what you should or should
19  not do; isn't that true?
20  A.  I did not seek guidance from anybody with the
21  exception of as I had stated when I received the
22  litigation hold confirming with Mr. Toner that I had
23  sent him and the organization everything with regard to
24  Ms. Pajak. No.

**Page 465**

1   Q.  The litigation hold specifically says if you
2   want guidance with regard to your requirements under
3   that litigation hold, you had somebody you could
4   contact; isn't that right?
5   A.  Yes, which, as I stated, I had done when I
6   received the litigation hold.
7   Q.  But you never did it that last week of your
8   employment as you were deleting materials from that
9   laptop; isn't that true?
10  A.  Again, you continue to ask the questions to
11  get to a different answer. If I've confirmed that
12  everything that I had with regard to Ms. Pajak was
13  already turned in to the organization, then there would
14  be no need for me to reaffirm that information that I
15  had that did not have anything to do with Ms. Pajak
16  couldn't be sent, transferred, forwarded, or deleted
17  from the laptop.
18  Q.  Now, you say that you forwarded information to
19  Mr. Toner that you thought was everything you had
20  related to Ms. Pajak; is that correct?
21  A.  Yes.
22  Q.  How did you do that? By email?
23  A.  By email.
24  Q.  So there's an email from you and I think you

**Page 466**

1   testified earlier that it was after she was terminated
2   on December 10, 2018; correct?
3   A.  Well, to be clear, every correspondence that I
4   had with Ms. Pajak from the June time frame on, I
5   conferred with Mr. Toner and he with the legal team
6   because she had made us aware that she was seeking
7   outside advice from an attorney. And so all
8   correspondence from that June time frame forward was
9   forwarded to, copied to, or in the possession of
10  Mr. Toner.
11       My confirmation with Mr. Toner upon Cyndi
12  being separated from the company was that I had
13  forwarded him everything and that he had everything, of
14  which he concurred. I, once again, when I received the
15  litigation hold on the 26th of February confirmed, once
16  again, with him that he had everything that I had with
17  regard to Ms. Pajak, and he concurred.
18  Q.  How would he know -- how would he possibly
19  know that he had everything that you did?
20  A.  Because I shared everything with him from June
21  forward whether it had been, you know, copies of text
22  messages or any, you know, correspondence she might have
23  sent to me otherwise or me to her. So he had everything
24  throughout the entire process.