IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYNTHIA D. PAJAK,

                Plaintiff,

v.                                        CIVIL ACTION NO. 1:19-CV-160
                                                    (KLEEH)

UNDER ARMOUR, INC.,
UNDER ARMOUR RETAIL, INC.,
and BRIAN BOUCHER,

                Defendants.

_____

OMNIBUS MEMORANDUM OPINION AND ORDER
_____

    Pending before the Court are *Under Armour's Motion* in Limine
*Under* Daubert *to Exclude Certain Testimony and Opinions of
Plaintiff's Expert, Craig Corkrean* [ECF No. 689], *Under Armour's
Motion* in Limine *Under* Daubert *to Exclude Testimony and Opinions
of Plaintiff's Expert, Paul McVoy* [ECF No. 704], and *Cynthia D.
Pajak's Motion to Exclude Heyward Bonyata, Esquire as an Expert
Witness* [ECF No. 695].

    For the reasons that follow, the Court **GRANTS in part** and
**DENIES in part** the motions. ECF Nos. 689, 704, 695.

    I.    PROCEDURAL BACKGROUND

    On July 16, 2019, Plaintiff, Cynthia Pajak ("Pajak"), sued
Under Armour, Inc., Under Armour Retail, Inc., and Brian Boucher
in the Circuit Court of Harrison County, West Virginia, alleging
she was discharged in retaliation for reporting various instances

OMNIBUS MEMORANDUM OPINION AND ORDER

of inappropriate workplace behavior and seeking damages and potential reinstatement. Her initial complaint alleges four causes of action, including: (1) wrongful discharge under Harless v. First National Bank of Fairmont, 246 S.E.2d 270 (W. Va. 1978); (2) violations of the West Virginia Human Rights Act ("WVHRA"); (3) negligent hiring, supervision, and retention; and (4) intentional infliction of emotional distress. Under Armour timely removed the case to this Court on August 19, 2019 [ECF No. 1]. On March 8, 2021, Pajak amended the complaint and asserted a fifth and sixth cause of action, Intentional Spoliation of Evidence against Defendants Under Armour and Brian Boucher. ECF No. 291, Am. Compl.

In the Motions pending before the Court, the parties seek to exclude certain expert witness testimony. ECF Nos. 689, 704, 695. Namely, Under Armour moves to exclude Craig Corkrean and Paul McVoy from testifying before the jury. ECF Nos. 689, 704. Pajak moves to exclude Heyward Bonyata from offering expert testimony. ECF No. 695. On August 23, 2022, the Court convened for a Daubert hearing to receive evidence and make these determinations. The Court makes its rulings on the motions herein.

**II.  FACTS**

Plaintiff, Cynthia Pajak ("Pajak"), initiated this lawsuit after she was discharged by her employer, Defendant Under Armour Retail, Inc. ECF No. 291, Am. Compl. at 1-2; ECF No. 750 at 2; Ex.

OMNIBUS MEMORANDUM OPINION AND ORDER

D, ECF No. 750-4. Pajak alleges that after she reported inappropriate conduct that created a hostile work environment, she was the victim of gender discrimination and a retaliatory discharge. ECF No. 291, Am. Compl. at 1-2.

On November 5, 2013, Under Armour, Inc., hired Pajak as its Regional Director of the East and Canada regions. Id. ¶¶ 8-9; ECF No. 750-2, Ex. B, Offer of Employment. Pajak worked remotely from Bridgeport, West Virginia and reported to the defendant, Brian Boucher ("Boucher"). ECF No. 291, Am. Compl. ¶¶ 5, 10. According to Pajak's state and federal tax documents for the tax year of 2018, she was employed by Under Armour Retail, Inc. ECF No. 750-2, Ex. E, Form 1095-C & W-2.

In January, April, and November 2018, female employees reported several instances of inappropriate workplace conduct to Pajak. The three instances of alleged protected activity relevant to Pajak's claims for retaliatory discharge are: (1) The Clarksburg Incident (January 2018), The Yammer Post (April 2018), and The Listening Session (November 2018). The Clarksburg Incident included a district manager, Joey McKenna, taking off his shirt and pretending to do a striptease and posting a photo of himself on Under Armour's internal social media site posing for a body building competition in a speedo, and another district manager making comments about a female colleague's appearance. Id. ¶ 15.

OMNIBUS MEMORANDUM OPINION AND ORDER

Pajak encouraged these employees to submit written statements, which she then provided to Boucher. Id. ¶ 16. In April 2018, the same district manager involved in the January 2018 striptease posted photographs of himself in a speedo posing in a body building competition to a social media site. Id. ¶ 19. Third, in November 2018, the Wall Street Journal published an article titled, "Under Armour's #METOO Moment: No more Strip Clubs on Company Dime." Id. ¶ 26. In response to the WSJ article, Founder and CEO Kevin Plank pledged to improve the company's culture, and Under Armour scheduled a call with Human Resource employees and all district managers to conduct an open forum on the article and address any concerns. Id. ¶ 28. McKenna reacted to the article by making jokes and down-playing any concerns. Id. According to Pajak, Boucher minimized the employees' concerns regarding each incident and directed Pajak to "move on." Id. ¶¶ 17, 32.

On June 12, 2018, Boucher delivered Pajak's midyear review, the "Half Time Huddle", which raised no concerns about her job performance. Id. ¶ 22. But a mere nine (9) days later, on June 21, 2018, Boucher, "unexpectedly and with no warning, called Ms. Pajak saying that he would like her to make an offer on her terms to leave Under Armour." Id. Boucher had not consulted Under Armour's human resources department before approaching Pajak. Id. ¶¶ 22-23. Boucher did not supplement this unexpected offer with

4

OMNIBUS MEMORANDUM OPINION AND ORDER

documentation of dissatisfaction regarding Pajak's performance. Id. Pajak was surprised by the negative feedback, as Boucher had not criticized her performance before this. See ECF No. 750-32, Ex. FF. Pajak declined to leave her position, and, on September 10, 2018, Boucher placed her on a sixty-day Performance Improvement Plan ("PIP"), although the typical "PIP period" at Under Armour is ninety days. ECF No. 291, Am. Compl., ¶ 25. Pajak contends Boucher provided no guidance in the PIP as to what areas of her performance needed to improve. Id. ¶ 25. She further alleges that the PIP contained only subjective performance metrics, and that, although Boucher told her he would meet with her regularly during the PIP period, he did so only once and that was at her request. Id. On December 10, 2018, Pajak was fired after her PIP period expired. Id. ¶¶ 9-10, 34.

Pajak sued on July 16, 2019. Under Armour had knowledge of a potential civil suit as early as September 2018 and at least by February of 2019. See ECF No. 294. On February 15, 2019, Pajak's counsel "sent Under Armour a demand letter outlining Ms. Pajak's claims and notifying the company of impending litigation against it." ECF No. 291, Am. Compl., ¶ 36. The letter included "Under Armour's evidentiary preservation obligations and instruct[ed] Under Armour to preserve all forms of potential evidence related to Ms. Pajak's claims." Id. Pajak alleges Defendants failed to

OMNIBUS MEMORANDUM OPINION AND ORDER

preserve this evidence, and relevant data to Pajak's claims was deleted. Id. ¶ 38.  Indeed, "while Under Armour at one point had physical custody of Mr. Boucher's Under Armour controlled cell phone, it relinquished custody on March 15, 2019, and now the device is missing with no explanation for its whereabouts." Id. ¶ 38. While "Under Armour claims it gave the device to Boucher and Boucher claims he returned it to Under Armour," it has never been found and therefore never disclosed in discovery. Id. ¶ 38. Documents and other information relating to Pajak's claims, including text messages involving Pajak, have been erased. Id. ¶¶ 39-40.

The causes of action alleged in the Amended Complaint include: (1) wrongful discharge under Harless v. First National Bank of Fairmont, 246 S.E.2d 270 (W. Va. 1978); (2) violations of the West Virginia Human Rights Act ("WVHRA"); (3) negligent hiring, supervision, and retention; (4) intentional infliction of emotional distress or tort of outrage; (5) Intentional Spoliation of Evidence against Defendant Under Armour; and (6) Intentional Spoliation of Evidence against Defendant Brian Boucher. ECF No. 291, Am. Compl.

**III. LEGAL STANDARD**

Federal Rule of Evidence 702 governs the admissibility of testimony by expert witnesses.

OMNIBUS MEMORANDUM OPINION AND ORDER

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or
> to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the
> product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods
> to the facts of the case.

Fed. R. Evid. 702. "An expert may base an opinion on facts or data
in the case that the expert has been made aware of or personally
observed." Fed. R. Evid. 703.

"[A] district court must ensure that the expert is qualified
and that the expert's testimony is both relevant and reliable."
United States v. Smith, 919 F.3d 825, 835 (4th Cir. 2019).
"Relevant evidence, of course, is evidence that helps 'the trier
of fact to understand the evidence or to determine a fact in
issue.'" Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir.
2017) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579,
591 (1993)). "[R]elevance . . . is a precondition for the
admissibility of expert testimony, in that the rules of evidence
require expert opinions to assist the 'trier of fact to determine
a fact in issue.'" United States v. Ancient Coin Collectors Guild,
899 F.3d 295, 318 (4th Cir. 2018) (quoting Daubert at 591).

The thrust of Rule 702 is to protect the jury from "evidence
that is unreliable for reasons they may have difficulty

OMNIBUS MEMORANDUM OPINION AND ORDER

understanding." City of Huntington v. AmerisourceBergen Drug Corp., No. 3:17-01362, No. 3:17-01665, 2021 WL 1596355, *2 (S.D.W. Va. Apr. 22, 2021) (quoting Quality Plus Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA., No. 3:18-cv-454, 2020 WL 239598, at *13 (E.D. Va. Jan. 15, 2020)). To assess reliability, the court conducts a flexible inquiry evaluating the expert's methodology rather than the expert's conclusion. TFWS v. Schaefer, 325 F.3d 234, 240 (4th Cir. 2003). "A reliable expert opinion must be based on scientific technical or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999). Daubert recited the non-exclusive factors:

> (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (quoting Daubert, 509 U.S. at 593-94).

Expert opinions that are "bare conclusion[s] without reliable support" must be excluded. See, e.g., Stolting v. Jolly Roger Amusement Park, Inc., 37 F. App'x 80, 83 (4th Cir. 2002); McEwen

OMNIBUS MEMORANDUM OPINION AND ORDER

v. Baltimore Washington Med. Ctr. Inc., 404 F. App'x 789, 791-92
(4th Cir. 2010). "[N]othing in either Daubert or the Federal Rules
of Evidence requires a district court to admit opinion evidence
that is connected to existing data only by the ipse dixit of the
expert." McEwen, 404 F. App'x at 791-92 (quoting Gen. Elec. Co. v.
Joiner, 522 U.S. 136, 146 (1997)). The proponent of the expert
testimony bears the burden of establishing its admissibility by a
preponderance of the evidence. Cooper v. Smith & Nephew, Inc., 259
F.3d 194, 199 (4th Cir. 2001); Daubert, 509 U.S. at 592 n. 10.

### IV.   DISCUSSION

#### A. Under Armour's Motion in Limine Under Daubert to Exclude Certain Testimony and Opinions of Plaintiff's Expert, Craig Corkrean [ECF No. 689]

Craig Corkrean ("Mr. Corkrean") is a retained expert by
Plaintiff to testify with respect to his forensic review of
Defendant Brian Boucher's laptop and cell phone relating to
Plaintiff's claim of intentional spoliation, Count V of the Amended
Complaint. ECF No. 689-1, Ex. A. Under Armour takes issue with
three (3) of Mr. Corkrean's disclosed areas of testimony and
opinions and seeks to exclude each from the jury's purview: (1)
the existence of "Null Message Bodies" associated with text
messages located on the digital image of Boucher's iPhone, (2) the
unavailability of a "WAL file", and (3) pictures of Boucher's
physical laptop. Under Armour argues the Court should exclude this

9

**Pajak v. Under Armour**                                              **1:19cv160**

<u>OMNIBUS MEMORANDUM OPINION AND ORDER</u>

testimony of Mr. Corkrean on the grounds that it is irrelevant and unreliable. There were no challenges to Mr. Corkrean's qualifications in the briefings or at the <u>Daubert</u> hearing, and the Court will not raise any here. ECF No. 758, <u>Daubert</u> Tr. 43:20-44:9.

### 1. Null Message Bodies

Mr. Corkrean was granted access to Defendant Boucher's iPhone SMS database using the forensic tool Cellebrite. ECF No. 758, <u>Daubert</u> Tr. 8:17-9:1. The SMS database is the primary repository in the iPhone containing all text messages sent and received to that iPhone. <u>Id.</u> 9:2-5. Mr. Corkrean recovered the SMS database by using the encrypted iTunes backup, and further investigated its contents through Cellebrite. <u>Id.</u> 9:2-12. One forensic anomaly Mr. Corkrean identified within the SMS database using Cellebrite is "Null Message Bodies." <u>Id.</u> 9:9-12. At first, Mr. Corkrean believed the Null Message Bodies were caused by a blank message or attachment. <u>Id.</u> 12:12-22. Now, after his deposition and additional testing that has not been produced in writing, Mr. Corkrean believes the Null Message Bodies are related to received group messages. <u>Id.</u> 13:1-20. A Null Message Body is the existence of a message record, including information such as the to and from participants, time stamp of the message, and metadata, but excludes any text content. <u>Id.</u> 11:6-24. One could examine the SMS database,

OMNIBUS MEMORANDUM OPINION AND ORDER

find Null Message Bodies, and determine what participants were involved in the group messaging, whether the message still exists, and time stamps of the message. Id. 52:22-53:19.

Essentially, Mr. Corkrean testified that the appearance of the Null Message Bodies, as described in the Boucher Report, is the result of **user** activity – not necessarily **user deletion** activity - within a group chat message such that the contents of the text column is missing. Id. 13:21-14:3, 52:22-53:19; ECF No. 682-2, Boucher Report, at 20-21. Null Message Bodies themselves are not created solely due to user deletion activity. ECF No. 758, Daubert Tr. 53:16-19, 57:15-22. Every time a group text message is created by a user, an entry for each group message participant is created, including a Null Message Body. Id. 52:22-53:19. Even if a group user or participant would delete a text message from a phone, the Null Message Body would still exist and appear in the SMS database. Id. A Null Message Body is created at the time a phone receives a group message. Id. 53:16-20. However, if a message is not deleted, while the Null Message Body would still exist, the message body would still be viewable and searchable within the SMS database. Id. 53:23-54:7. When a user deletes a text from an iPhone, it deletes the message entry record from the SMS database, but a Null Message Body remains. ECF No. 758, Daubert Tr. 18:19-19:4. Still undetermined regarding these Null Message Bodies is

11

Pajak v. Under Armour                                    1:19cv160

## OMNIBUS MEMORANDUM OPINION AND ORDER

the cause of the phenomenon and any content of the messages. Id. 18:12-19:8.

9,453 Null Message Bodies were reported on Defendant Boucher's iPhone, and some dated back to the year 2017. Id. 33:5-19. Mr. Corkrean did not thoroughly examine the SMS database to determine the number of duplicates incorporated in the 9,453 Null Message Bodies amount, but opined that it included duplicates. Id. 33:20-34:7. A number of Null Message Bodies were identified as Under Armour employees and other contacts of Defendant Boucher. Id. 34:12-17.

Under Armour argues testimony describing Null Message Bodies is irrelevant because it is not evidence of user deletion, Mr. Corkrean overstates the volume of the Null Message Bodies present in Defendant Boucher's iPhone, and Null Message Bodies occurred with multiple contacts in Defendant Boucher's iPhone, not just with Under Armour contacts. Plaintiff maintains Mr. Corkrean's testimony of Null Message Bodies will assist the trier of fact and is integral evidence related to Boucher's iPhone.

The Court finds evidence of Null Message Bodies would assist the trier of fact to understand the evidence and determine a fact in issue; therefore, Mr. Corkrean's testimony about Null Message Bodies will be permitted at trial. Whether Defendant Boucher's iPhone was lost or destroyed [see ECF Nos. 607, 722 at 3], it was

Pajak v. Under Armour                                    1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER
_____

not made available to Mr. Corkrean for a physical inspection. Therefore, the only iPhone material available to Mr. Corkrean is the iTunes back-up of that iPhone. In evaluating that available material for purposes of litigating Plaintiff's claims, Mr. Corkrean discovered Null Message Bodies. This evidence will assist the jury in determining whether "there was more information that could have been gleaned from [the iPhone] that would be valuable to Ms. Pajak's claims had it been preserved." ECF No. 722 at 10-11. Null message bodies being relevant evidence, the motion [ECF No. 689] is **DENIED** on this ground.

    **2. WAL File**

    The second issue raised by Under Armour is Mr. Corkrean's testimony regarding the "WAL File." The WAL file, or write-ahead log file, is used in software development or application development. ECF No. 758, Daubert Tr. 19:18-24. The WAL file is a temporary file that records recent changes in an SMS database. Id. It is a temporary storage for the SMS database that is periodically purged. Id. 20:3-16. WAL timelining is a forensic technique that could be performed if the iPhone had been preserved, but in this case, it was not. Id. 22:17-23:7, 51:5-7. WAL timelining would tell the analyst approximate deletion dates of text messages. Id., 50:2-7.

Pajak v. Under Armour                                          1:19cv160

## OMNIBUS MEMORANDUM OPINION AND ORDER

A checkpoint occurs when a phone is turned off and on. Id. 25:20-22, 147:4-7. According to Paul Sanderson's book, upon which Mr. Corkrean partly relied in evaluating the evidence, every time an iPhone is turned off and on, there is a deletion of the WAL File. Id. 25:20-22. However, during Mr. Corkrean's studies in this case, he turned the phone off and on, jailbroke it, and was able to maintain the WAL File. Id. 26:4-6. In other words, the WAL File was not automatically deleted in Mr. Corkrean's case. Id.

Under Armour argues the WAL File testimony is irrelevant because Mr. Corkrean could not, even if he was presented with a properly preserved iPhone, state with any certainty the deletion dates of text messages. Plaintiff maintains, and Mr. Corkrean's testimony shows, Mr. Corkrean would have been able to determine a window of time when deletion activity occurred had he been able to perform WAL Timelining on the properly preserved iPhone.

The Court likewise finds evidence of the WAL File would assist the trier of fact to understand the evidence and determine a fact in issue; therefore, Mr. Corkrean's testimony about the WAL File will be permitted at trial. This expert testimony is relevant and supports Plaintiff's claims. Because, according to Mr. Corkrean, a forensic examiner could determine a window of time when deletion activity occurred had the iPhone been properly preserved, the WAL File evidence is relevant and otherwise admissible. And because

14

Pajak v. Under Armour                                    1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER

the iPhone was not properly preserved, Plaintiff was stripped of
the opportunity to conduct WAL Timelining to discover any available
data from the WAL File. Evidence of the WAL Timelining process and
the WAL File itself is therefore admissible. The motion [ECF No.
689] is **DENIED** on this ground.

### 3. Pictures

Under Armour seeks to exclude a number of pictures of
Boucher's laptop when it was physically examined by Mr. Corkrean
on February 22, 2021. Under Armour argues the pictures are
irrelevant and are prejudicial because they are labeled "crime
scene photos." Plaintiff argues in opposition, stating label
"Sirchie" depicted in the photographs will not notify a lay juror
that this company – let alone the laptop itself - could be tied to
crime scene equipment.

The photographs at issue are included in the Boucher Report
at pages 26-30. ECF No. 689-2, Boucher Report, at 26-30. The
photographs have no bearing on Mr. Corkrean's opinions about the
data found in the laptop itself. ECF No. 758, Daubert Tr. 36:13-
22. Experts in Mr. Corkrean's field regularly catalog and
photograph evidence that they are evaluating, often to provide a
scale and log any serial numbers. Id. 54:11-55:11.

The Court does not find these photographs to be irrelevant or
prejudicial. Mr. Corkrean photographed the laptop as part of his

Pajak v. Under Armour                                           1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER

process in evaluating and logging the evidence. Nothing about the word "Sirchie" apparent from the photographs prejudices the Defendants in any way, and the photographs are relevant to Mr. Corkrean's process in reaching his opinions. The Court finds this evidence admissible and the motion [ECF No. 689] is **DENIED**.

**B. Under Armour's Motion in Limine Under Daubert to Exclude Testimony and Opinions of Plaintiff's Expert, Paul McVoy [ECF No. 704]**

Paul McVoy is Plaintiff's expert witness also supporting her spoliation claim. ECF No. 329. Mr. McVoy is the Founder and Chief Executive Officer of Meta-e Discovery LLC. ECF No. 731. His role includes counseling clients in discovery strategy and reasonable preservation and collection of discovery. Id. Mr. McVoy has been working in the e-discovery space since 2009. In the past four years, Mr. McVoy has provided expert testimony in four federal cases. ECF No. 691-3 at 23–24. Mr. McVoy has never been disqualified as an expert witness, and his testimony has never been excluded by a court. ECF No. 691-5 at 129. Under Rule 702, Plaintiff must establish by a preponderance of the evidence that Mr. McVoy's testimony is sufficiently reliable and relevant. Cooper, 259 F.3d at 199.

While no party called Mr. McVoy to the stand during the Daubert hearing, Under Armour argues the Court should exclude his testimony and opinions on the grounds that he is unqualified as an

Pajak v. Under Armour                                          1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER

expert, and his opinions are unreliable pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. Mr. McVoy proposes to testify that Under Armour failed to implement and execute a proper litigation hold and willfully failed to do so in order for data to be destroyed. In short, Defendants believe Mr. McVoy will testify to Mr. Boucher's intent while preserving, or failing to preserve, evidence of Plaintiff's intentional spoliation claim.

Plaintiff argues Mr. McVoy's opinion on e-discovery industry standards is reliable and otherwise proper under Rule 704 of the Federal Rules of Evidence. Mr. McVoy will not testify to any inappropriate legal opinions, and will instead answer questions such as, what steps a person would take to appropriately implement and maintain a litigation hold, and how collection and preservation of ESI, data, and devices should be conducted. ECF No. 758, Daubert Tr. 75:4-23.

## 1. Qualification

First, Defendants challenge Mr. McVoy's qualifications, citing his lack of specialized knowledge, skill, experience, training, or education of the implementation of litigation holds and preservation of evidence. ECF No. 704 at 3-4. For purposes of Defendants' motion [ECF No. 704] the Court finds Mr. McVoy qualified under Rule 702 to give an expert opinion on industry

17

Pajak v. Under Armour                                          1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER

standards and best practices related to e-discovery, device and data preservation, and litigation hold implementation and management. Mr. McVoy, being the Founder and Chief Executive Officer of Meta-e Discovery LLC, has sufficient training and expertise in litigation support services, including e-discovery, to offer the expert opinion. ECF Nos. 731, 704 at 4. At this preliminary stage, with the evidence and testimony presented to the Court, including Mr. McVoy's curriculum vitae and Report, the Court finds him qualified to render an expert opinion as outlined in detail below. The motion [ECF No. 704] is **DENIED** on this ground.[1]

### 2. Relevancy

Under Armour argues Mr. McVoy's testimony is irrelevant because Under Armour's state of mind would not assist the trier of fact in determining a fact at issue and a party's knowledge or state of mind are not appropriate for expert testimony. While an essential element of Plaintiff's intentional spoliation cause of action is the Defendants' knowledge and willful destruction of evidence, the Court agrees with Defendants that Mr. McVoy's expert witness testimony as to Defendants' state of mind should be precluded because it would not assist the trier of fact.

---

[1] Plaintiff is still required to offer Mr. McVoy as an expert witness at the jury trial and move to qualify him under Rule 702 of the Federal Rules of Evidence.

### OMNIBUS MEMORANDUM OPINION AND ORDER

The Court is aware the only constraint on an expert's testimony as to intent is within the confines of a criminal action. See Fed. R. Evid. 704(b); United States v. Fuentes, No. 89-5198, 1991 WL 10069, *4 (4th Cir. 1991). However the jury need not hear Mr. McVoy's expert opinion as to Defendants' state of mind – the jury will have the ability to digest the evidence presented on the intentional spoliation claim and decide for themselves what Defendants' intent was or was not. Because the jury will make their own determination on Defendants' intent, without the need to hear Mr. McVoy's opinion, Mr. McVoy is precluded from testifying as to Defendants' intent or state of mind during the discovery preservation process. Therefore, the motion [ECF No. 704] is **GRANTED** as to McVoy making statements regarding Defendants' state of mind. Specifically, Mr. McVoy finding it is "a reasonable conclusion that [Mr. Boucher] understood what he was doing and did it intentionally in violation of the legal hold that he acknowledges he was under" is excluded. ECF No. 704-1, Ex. A, Report of Paul McVoy at 17.

#### 3. Reliability

Under Armour attacks Mr. McVoy's reliability as an expert witness on the grounds that his opinions are speculative, conclusory, and not based upon methodology. To assess reliability, courts should question an expert's methodology rather than the

Pajak v. Under Armour                                    1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER

expert's conclusion. TFWS v. Schaefer, 325 F.3d 234, 240 (4th Cir. 2003). "A reliable expert opinion must be based on scientific technical or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999). Courts are not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." McEwen v. Baltimore Washington Med. Ctr. Inc., 404 F. App'x 789, 791-92 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). While an expert may not instruct the jury as to what conclusion to reach, the opinion may embrace an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704(a).

The "willful destruction of evidence" element of the spoliation claim is most at issue in Mr. McVoy's proposed testimony. Mr. McVoy's opinions are based on discovery and deposition testimony in this case. Specifically, Mr. McVoy reviewed Defendant Boucher's deposition testimony and Craig Corkrean's report. ECF No. 704-1, Ex. A, Report of Paul McVoy at 17. Mr. McVoy relied upon Under Armour's own Rule 30(b)(6) testimony in drawing his conclusions that Under Armour and Defendant Boucher "either actively destroy[ed] data (as in Brian Boucher's case) or allow[ed] data to be destroyed (as in Under

Pajak v. Under Armour                                    1:19cv160

### OMNIBUS MEMORANDUM OPINION AND ORDER

Armour's case)." ECF No. 704-1, Ex. A, Report of Paul McVoy at 2-3.

"In formulating his opinions, Mr. McVoy will rely on his education, training, and experience in e-discovery Best Practices and industry standards and his extensive involvement with The Sedona Conference." ECF No. 704-2, Pl's Supp. Report, Ex. B. Mr. McVoy also based his opinion, in part, on a Jackson Kelly PLLC blog on electronic discovery, and writings of Kramon & Graham attorneys and JND e-discovery materials. Id. In assessing the best practices applicable to parties facing a litigation hold, Mr. McVoy relied upon various conference materials in addition to The Sedona Conference, such as Georgetown eDiscovery Conference and Duke University eDiscovery materials. ECF No. 731 at 17. These best practices principles appear to be widely accepted. Based on Mr. McVoy's expert report and the plaintiff's representations at the Daubert hearing, the Court finds Mr. McVoy's opinions regarding e-discovery best practices are based upon proper methodology required in the industry of e-Discovery. Mr. McVoy will be permitted to offer opinions regarding industry standards and best practices within the e-Discovery field, and whether the defendants complied with the same. Proposed testimony by Mr. McVoy that Defendants Under Armour and/or Boucher failed to take reasonable steps or execute a proper litigation hold is permitted. Therefore,

Pajak v. Under Armour                                    1:19cv160

## OMNIBUS MEMORANDUM OPINION AND ORDER

the motion to exclude Mr. McVoy's expert testimony [ECF No. 704] is **DENIED** as to his opinion on industry standards and best practices related to e-discovery, device and data preservation, and litigation hold implementation and management. However, Mr. McVoy is precluded from making legal conclusions. The motion to exclude Mr. McVoy's expert testimony [ECF No. 704] is **GRANTED** as to any proposed testimony concerning whether Defendants' actions, or inactions, violated or complied with the Federal Rules of Civil Procedure, or other court rules and case law.

It is the Court's role to gatekeep proposed expert testimony. Expert testimony should be admitted only if it is reliable and helps the jury understand the issues or evidence. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993). The Court has confidence Mr. McVoy's testimony on industry standards as outlined herein is reliable and that it will assist the trier of fact.

### C. Cynthia D. Pajak's Motion to Exclude Heyward Bonyata, Esquire as an Expert Witness [ECF No. 695]

#### 1. Qualification

Ms. Heyward Bonyata is an attorney with the law firm Nelson Mullins Riley & Scarborough LLP and is a licensed member of the bar. 706-1, Decl. Bonyata. ¶ 4; ECF No. 706-2, Bonyata Dep. 22:5-

Pajak v. Under Armour                                    1:19cv160

OMNIBUS MEMORANDUM OPINION AND ORDER

9. Ms. Bonyata's "practice focuses on e-discovery, information management, business litigation, antitrust litigation, and pharmaceutical and medical device litigation." 706-1, Decl. Bonyata. ¶ 5. She has been discovery counsel for a Fortune 50 corporation and routinely advises corporations regarding their discovery preservation obligations. Id. Ms. Bonyata is a former chair of DRI's E-Discovery Committee and Cybersecurity & Data Privacy Committee. Id. ¶ 8. She has published numerous publications in the areas of e-discovery and information governance, and has provided declarations or testimony in three (3) other court cases. Id. ¶¶ 9-10. Ms. Bonyata has never been qualified as an expert witness by a court, nor has she sought to be qualified. ECF No. 706-2, Bonyata Dep. 21:10-15. This case would be her first time as a disclosed testifying expert. Id. 21:16-17.

Ms. Bonyata has sufficient training and expertise in e-discovery, information management, and discovery preservation to offer the expert opinion as outlined below. At this preliminary stage, with the evidence and testimony presented to the Court, including Ms. Bonyata's Declaration, the Court finds her qualified to render an expert opinion as outlined in detail below. The motion [ECF No. 695] is **DENIED** on this ground.[2]

---

[2] This ruling does not extend to the jury trial. Defendants are required to offer Ms. Bonyata as an expert witness at the trial

23

Pajak v. Under Armour                                          1:19cv160

<u>OMNIBUS MEMORANDUM OPINION AND ORDER</u>

**2. Legal Conclusions**

Plaintiff argues Ms. Bonyata's expert report is riddled with legal opinions and therefore her testimony must be excluded. Under Armour's disclosure provides that Ms. Bonyata will be called to testify about her expert opinions regarding "Under Armour's efforts to preserve Mr. Boucher's iPhone and the triggering of Under Armour's duty to preserve information potentially relevant to Ms. Pajak." ECF No. 706-1, Ex. A. Ms. Bonyata's report contains two proposed expert opinions: (1) that Under Armour's duty to preserve evidence was triggered when it "reasonably should have anticipated litigation in connection with Ms. Pajak's termination no earlier than February 19, 2019, when it received the February 15, 2019 letter from Ms. Pajak's counsel"; and (2) that "Under Armour's actions to preserve content on the Boucher iPhone potentially relevant to this matter were reasonable; consistent with contemporaneous, commonly accepted practices; and in keeping with the concept of proportionality." ECF No. 706-1, Ex. A.

At the <u>Daubert</u> hearing, the parties agreed that Ms. Bonyata's first opinion would not be offered to the jury because it contradicts the Court's finding of Defendants' knowledge of the civil suit arising as early as September 2018 and at least by

---

and qualify her under Rule 702 of the Federal Rules of Civil Procedure.

Pajak v. Under Armour                                          1:19cv160

### OMNIBUS MEMORANDUM OPINION AND ORDER

February 2019. ECF No. 758, <u>Daubert</u> Tr. 73:21-24. Turning to her
second opinion, that "Under Armour took reasonable, good faith,
proportionate, and commonly accepted steps to preserve potentially
relevant content on the Boucher iPhone," Under Armour argues this
opinion is a legal conclusion and would leave nothing for the jury
to decide. Plaintiff argues Ms. Bonyata attempts to invade the
Court's role in determining questions of law, mainly the concepts
of reasonableness and proportionality as they relate to Rules
26(b)(1) and 37(e) of the Federal Rules of Civil Procedure.

Here, the Court must decide "'whether the terms used by the
witness have a separate, distinct and specialized meaning in the
law different from that present in the vernacular.'" <u>Myers v.
Taylor</u>, No. 1:14cv156, 2015 WL 12763630, *3 (N.D.W. Va. June 24,
2015). It is the role of the Court to "distinguish opinion
testimony that embraces an ultimate issue of fact from opinion
testimony that states a legal conclusion." <u>Id.</u> (internal citation
omitted).

Ms. Bonyata will be permitted to offer opinions regarding
industry standards and best practices within the e-Discovery
field, and whether the defendants complied with the same. Proposed
testimony by Ms. Bonyata that Defendants Under Armour and/or
Boucher took reasonable steps or executed a proper litigation hold
is permitted. Therefore, the motion to exclude Ms. Bonyata's expert

25

**Pajak v. Under Armour**                                        **1:19cv160**

OMNIBUS MEMORANDUM OPINION AND ORDER

---

testimony [ECF No. 695] is **DENIED** as to her opinion on industry standards and best practices related to e-discovery, device and data preservation, and litigation hold implementation and management. However, Ms. Bonyata is precluded from making legal conclusions. The motion to exclude Ms. Bonyata's expert testimony [ECF No. 695] is **GRANTED** as to any proposed testimony concerning whether Defendants' actions, or inactions, violated the Federal Rules of Civil Procedure, or other court rules and case law.

   **V.    CONCLUSION**

   For the reasons consistent in this Memorandum Opinion and Order, the Court:

1. **DENIES** Under Armour's Motion in Limine Under Daubert to Exclude Certain Testimony and Opinions of Plaintiff's Expert, Craig Corkrean [ECF No. 689];

2. **DENIES in part** and **GRANTS in part** Under Armour's Motion in Limine Under Daubert to Exclude Testimony and Opinions of Plaintiff's Expert, Paul McVoy [ECF No. 704];

3. **DENIES in part** and **GRANTS in part** Cynthia D. Pajak's Motion to Exclude Heyward Bonyata, Esquire as an Expert Witness [ECF No. 695]; and

4. **GRANTS** Defendant Brian Boucher's Motion for Joinder in Under Armour's Motions [ECF No. 694].

   It is so **ORDERED.**

   The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record.

26

**Pajak v. Under Armour**                                    **1:19cv160**

## OMNIBUS MEMORANDUM OPINION AND ORDER

**DATED:** October 24, 2022

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA